Samuel DEUTSCH, individually and as
Administrator of the Estate of
Helene Deutsch, Plaintiff,

v.

NOVARTIS PHARMACEUTICALS
CORPORATION, Defendant.

Beth Forman, individually and
as Executrix of the Estate of
John Napolitano, Plaintiff,

v.

Novartis Pharmaceuticals Corporation,
Defendant.

Nos. 09–CV–4677 (ADS)(WDW),
09–CV–4678 (ADS)(WDW).

United States District Court,
E.D. New York.

March 8, 2011.

Valad & Vecchione, PLLC by Bart T. Valad, Esq., John J. Vecchione, Esq., of Counsel, Fairfax, V.A., for Plaintiffs.

Hollingsworth LLC by Katharine R. Latimer, Esq., Martin Calhoun, Esq., of Counsel, Washington, D.C., Rivkin Radler LLP, by Jesse J. Graham, II, Esq., of Counsel, Uniondale, N.Y., for Defendants.

### MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

Samuel Deutsch ("Plaintiff Deutsch"), individually and as an administrator of the

estate of Helene Deutsch (collectively the "Deutsch case"), and Beth Forman ("Plaintiff Forman" and together with Plaintiff Deutsch "the Plaintiffs"), individually and as administrator of the estate of John Napolitano (collectively the "Forman case"), commenced these products liability actions against Novartis Pharmaceuticals Corporation ("Novartis" or "NPC"), alleging that the Novartis drugs Aredia and Zometa caused Mrs. Deutsch and Mr. Napolitano to develop a condition referred to as osteonecrosis of the jaw. Both Mrs. Deutsch and Mr. Napolitano passed away after filing the instant lawsuits. However, their respective spouses, Samuel Deutsch and Beth Forman, continue to pursue the claims against Novartis. Presently before the Court are nine *Daubert* motions by Novartis to exclude testimony by the Plaintiffs' retained and non-retained experts (the "treating physicians"); a *Daubert* motion by the Plaintiffs to exclude the causation testimony of the experts retained by Novartis; and a motion by the Plaintiffs to unseal documents. The Court now rules on all of these motions.

## I. BACKGROUND

Although familiarity with the factual background and procedural history of this case is assumed, a brief review is in order.

This lawsuit involves two FDA-approved intravenous bisphosphonate ("IV BP") drugs manufactured by Novartis, namely, Aredia (also known as pamidronate) and Zometa (also known as zoledronic acid). Both Aredia and Zometa are typically prescribed to patients with certain kinds of advanced cancer affecting bone.

Mrs. Deutsch received both Aredia and Zometa as treatment for metastatic breast cancer, and Mr. Napolitano received Zometa as part of his treatment for metastatic prostate cancer. After receiving the IV BP drugs, Mrs. Deutsch and Mr. Na-

politano allegedly developed osteonecrosis of the jaw ("ONJ"). The Plaintiffs' allege that Mrs. Deutsch and Mr. Napolitano developed a form of ONJ that is caused by bisphosphonate drugs, referred to as bisphosphonate-related ONJ ("BRONJ"), bisphosphonate-induced ONJ ("BIONJ") or bisphosphonate ONJ ("BONJ"). The American Association of Oral and Maxillofacial Surgeons ("AAOMS") refers to ONJ that has allegedly resulted from bisphosphonate use as bisphosphonate-related osteonecrosis of the jaw and defined three requirements for its occurrence:

1. Current or previous treatment with a bisphosphonate

2. Exposed bone in the maxillofacial region that has persisted for more than 8 weeks

3. No history of radiation therapy to the jaws

Salvatore Ruggiero, et al., *AAOMS Position Paper on Bisphosphonate–Related Osteonecrosis of the Jaws–2009 Update,* J. Oral Maxillofacial Surgery, at 3 (2009) (hereinafter *"AAOMS 2009 Position Paper "*). The Plaintiffs' are primarily proceeding on strict products liability, negligence, and breach of implied warranty claims against Novartis, predicated on its alleged failure to warn of the risks associated with Aredia and Zometa.

On May 24, 2006, the Plaintiffs' cases against Novartis were consolidated with similar cases pursuant to the Multi–District Litigation Act and transferred to United States District Judge Todd J. Campbell in the Middle District of Tennessee ("the MDL court"). In the MDL court, Novartis filed two general summary judgment motions: (1) Motion for Summary Judgment Based upon a Failure of General Causation Proof under *Daubert* ("Causation Summary Judgment Motion") and (2) Motion for Summary Judgment on the Adequacy of its Aredia and Zometa

Warnings ("Warnings Summary Judgment Motion"). In conjunction with the summary judgment motions, Novartis filed *Daubert* motions to exclude the expert testimony of Dr. Keith Skubitz, Dr. James Vogel, Professor Wayne Ray, Ph.D. ("Prof. Ray"), Dr. Talib Najjar, Dr. Robert Marx (consisting of two separate motions, one to exclude his litigation-wide testimony and one to exclude his case-specific testimony in the Forman case), Dr. Suzanne Parisian, Dr. Robert Fletcher, Dr. Paul Hanson, Dr. John Hellstein, and the Plaintiffs' non-retained experts. The Plaintiffs' also filed *Daubert* motions, including one to exclude the testimony on the causation of BONJ by Novartis' oncologic experts.

By orders dated August 13, 2009, the MDL court denied both the Causation Summary Judgment Motion, *In re Aredia and Zometa Prods. Liab. Litig.* ("MDL Causation Order"), No. 06–MD–1760, 2009 WL 2497536 (M.D.Tenn. Aug. 13, 2009) and the Warnings Summary Judgment Motion, *In re Aredia and Zometa Prods. Liab. Litig.*, No. 06–MD–1760, Docket # s 2766, 2767 ("*MDL Warnings Order*"). In addition, the MDL court either denied or denied in part and mooted in part Novartis' *Daubert* motions to exclude the expert testimony of Dr. Skubitz, Dr. Vogel, Dr. Najjar, and the litigation-wide and case specific testimony of Dr. Marx. Finally, the MDL court mooted in their entirety Novartis' motions to exclude the expert testimony of Dr. Hanson, Dr. Hellstein, Prof. Ray, Dr. Fletcher, Dr. Parisian, as well as the Plaintiffs' non-retained experts, and the Plaintiffs' motions to exclude the expert testimony on the causation of BONJ by Novartis' oncologic experts.

Following the resolution of these motions, on September 25, 2009, the MDL court remanded the Deutsch case and the Forman case back to this Court for trial. On December 16, 2009, the Court held a case management conference where it granted the parties' request to file *Daubert* motions on issues not previously decided by the MDL court. Subsequently, the parties filed the motions that are the subject of this decision. Specifically, Novartis filed *Daubert* motions to exclude the expert testimony of (1) Dr. Skubitz, (2) Dr. Vogel, (3) Dr. Marx, (4) Prof. Ray, (5) Dr. Fletcher, (6) Dr. Parisian, (7) Plaintiffs' non-retained experts with regard to causation, (8) Dr. Hanson, and (9) Dr. Hellstein. The Plaintiffs' filed (10) a *Daubert* motion to exclude testimony on causation of BONJ by Novartis' oncologic experts and (11) a motion to unseal documents.

As an initial matter, the Plaintiffs' have stipulated that Drs. Hanson and Hellstein will not testify at trial and therefore the Court will not address those motions. In addition, Novartis has stipulated to unseal certain documents (Calhoun Decl. Unseal Motion, Ex. 1), and to resubmit redacted versions of certain documents (*Id.*, Ex. 3) and therefore the motion to unseal with respect to those documents is moot. With regard to the remaining documents subject to the motion to unseal that the Plaintiffs' contend were improperly designated pursuant to the parties' protective order, the Court denies the Plaintiffs' request without prejudice to file the motion before United States Magistrate Judge William D. Wall.

## II. DISCUSSION

### A. Legal Standard for Admissibility under Rule 702 and Daubert

The present motions seek to either exclude certain experts entirely or certain lines of expert testimony for failing to satisfy the requirements of Federal Rule of Evidence 702 ("Rule 702"). Rule 702 provides that:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. As articulated by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), Rule 702 "clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify" and "assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." As the Supreme Court further explained in *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), Rule 702 requires that a court fulfill this "gatekeeping" function by "mak[ing] certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."

■ To determine whether expert testimony is admissible, the court must consider whether (1) the witness is qualified as an expert to testify as to a particular matter; (2) the witness has based his opinion upon reliable data and methodology; (3) the expert's testimony on the particular subject is relevant because it will assist the trier of fact; and (4) pursuant to Rule 403 the testimony's "probative value is substantially outweighed by the danger of un-

fair prejudice, confusion of the issues, or misleading the jury." *Nimely v. City of New York,* 414 F.3d 381, 397 (2d Cir.2005) (quoting Fed.R.Evid. 403).

■ To be qualified to testify as an expert under Rule 702, the Court must be satisfied that "the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Daubert,* 509 U.S. at 592, 113 S.Ct. 2786. "If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *In re Zyprexa Prods. Liab. Litig.,* 489 F.Supp.2d 230, 282 (E.D.N.Y.2007) (citing *Stagl v. Delta Air Lines, Inc.,* 117 F.3d 76, 80 (2d Cir.1997)); *see also Rupolo v. Oshkosh Truck Corp.,* No. 05–Cv–2978, 749 F.Supp.2d 31, 37, 2010 WL 2244386, at *4 (E.D.N.Y. June 01, 2010) ("In a product liability action, an expert witness is not strictly confined to his area of practice, but may testify concerning related applications; a lack of specialization affects the weight of the opinion, not its admissibility.") (internal quotation marks and citation omitted).

When dealing with challenges to the reliability of scientific evidence, the court must focus on the methodology that the experts used to draw a conclusion and not on the conclusion itself. *See Daubert,* 509 U.S. at 590, 595, 113 S.Ct. 2786. In *Daubert,* the Supreme Court identified several non-exclusive factors that a court may consider such as: (1) whether the expert's conclusions have been tested or are testable; (2) whether the expert's conclusions have been published and subjected to peer review; (3) whether the scientific technique has a potential or known error rate; and (4) whether the expert's conclusions have gained general acceptance within the

scientific community. *Id.* at 593–94, 113 S.Ct. 2786. This list is not exhaustive. Other factors that courts have found relevant in assessing the reliability of expert testimony include:

> (1) whether the expert is proposing to testify about matters growing directly out of independent research he or she has conducted or whether the opinion was developed expressly for purposes of testifying; (2) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (3) whether the expert has adequately accounted for obvious alternative explanations; (4) whether the expert is being as careful as he would be in his regular professional work; and (5) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion offered.

*In re Silicone Gel Breast Impl. Prods. Liab. Litig.,* 318 F.Supp.2d 879, 890 (C.D.Cal.2004) (citing Fed.R.Evid. 702 Advisory Committee's Notes). These factors are "helpful, [but are] not definitive" and "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co.,* 526 U.S. at 151, 153, 119 S.Ct. 1167 (emphasis in original); *Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256, 265 (2d Cir.2002) ("[I]n analyzing the admissibility of expert evidence, the district court has broad discretion in determining what method is appropriate for evaluating reliability under the circumstances of each case.").

 "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Id.* at 266; *Zyprexa,*

489 F.Supp.2d at 284 ("Expert opinions based on insufficient facts or data, or on unsupported suppositions is not acceptable."). On the other hand, "[w]here an expert otherwise reliably utilizes scientific methods to reach a conclusion, lack of textual support may "go to the weight, not the admissibility" of the expert's testimony." *Amorgianos,* 303 F.3d at 267 (citing *McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1044 (2d Cir.1995)). "A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible." *Id.* at 267.

Ultimately, when determining whether a proffered expert's testimony is reliable, the court "must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Id.* at 266; *see also Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) (holding that "conclusions and methodology are not entirely distinct from one another," and that "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). Rule 702 codifies a liberal admissibility standard and "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786.

"The final part of a trial court's gatekeeping task is to determine whether an expert's testimony is 'relevant to the task at hand'; namely, whether the expert's reasoning or methodology can be properly applied to the facts before the court." *Lidle v. Cirrus Design Corp.,* No. 08–CV–1253, 2010 WL 2674584, at *4 (S.D.N.Y. July 6, 2010) (quoting *Daubert,* 509 U.S. at

592–93, 113 S.Ct. 2786); *see also Stagl v. Delta Air Lines, Inc.,* 117 F.3d 76, 81 (2d Cir.1997). As stated in Federal Rule of Evidence 401, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. In *Daubert,* the Court described the Rule 401 relevance consideration as one of "fit," requiring a "valid scientific connection" between the subject matter of the expert's testimony and the factual issues to be determined by the jury. *Daubert,* 509 U.S. at 591–92, 113 S.Ct. 2786; *Lidle,* 2010 WL 2674584, at *4.

### B. As to Whether the MDL court Rulings are the Law of the Case

As previously noted, the MDL court denied Novartis' Causation Summary Judgment Motion and Warnings Summary Judgment Motion, and denied in part and mooted in part the *Daubert* motions to exclude the testimony of Drs. Vogel, Skubitz, and Marx. In the course of briefing the MDL motions, Novartis made a number of arguments against the admissibility of these experts' opinions on general causation and failure to warn, including the contention that they lacked the requisite expertise under *Daubert* and employed unreliable methodologies. Rather than address the validity of each argument individually, the MDL court summarily denied the motions—with the exception of certain issues that were mooted because they were not relevant to the summary judgment motion—holding with respect to the Causation Summary Judgment Motion that:

Defendant's and Plaintiffs' briefs convincingly demonstrate why the arguments of both sides go to the weight of the experts' testimony, not the admissibility. The parties have presented more than unsupported speculation on both sides of this issue as to whether Aredia and Zometa can cause ONJ. Defendant's arguments impugn the accuracy of Plaintiffs' experts' opinions but do not undermine the general scientific reliability under *Daubert.* The Court finds that Plaintiffs have satisfied their burden of establishing that their experts' general causation opinions are admissible under *Daubert* and Fed.R.Evid. 702.

*MDL Causation Order,* 2009 WL 2497536, at *2, and with regard to the Warnings Summary Judgment Motion that:

Defendant's experts say the warnings were adequate, and Plaintiffs' experts say the warnings were false and misleading. The Court finds that the jury will have to determine which experts are credible, in whole or in part, and which side of this argument to believe.

*MDL Warnings Order* at 3.

In denying the motions as to Dr. Vogel and Dr. Skubitz, Judge Campbell, held that Dr. Vogel's and Dr. Skubitz's "testimony concerning general causation and the scientific and medical accuracy of warnings given by Novartis is clearly more than unsupported speculation" and that "Plaintiffs' have carried their burden of demonstrating that [Dr. Vogel's and Dr. Skubitz's] testimony concerning general causation and the accuracy of warnings is admissible under *Daubert.*" (Vogel Order at 3; Skubitz Order at 3.) With regard to the motion to exclude the litigation-wide testimony of Dr. Marx, the MDL court held that Dr. Marx was qualified to give opinions on "(1) the causal connection between Aredia and Zometa and ONJ [and] (2) treatment of and preventative measures for ONJ" (Marx Litig.-Wide Order at 1–2), and that Dr. Marx's testimony on these subjects were "clearly more than unsupported speculation" and that the

"plaintiffs have carried their burden of demonstrating Dr. Marx's testimony is admissible under *Daubert*" (*Id.* at 3–4).

While couching the instant motions, for the most part, in terms of objecting to specific opinions not raised to the MDL court or mooted by the MDL court, Novartis asserts a number of the same arguments with respect to the experts qualifications and the reliability of the factual basis underlying their opinions. Thus, the questions for this Court, are whether the MDL court's summary rulings can be read to have rejected all of Novartis' arguments, and if so, whether those rejections constitute the law of the case as to the admissibility under *Daubert* of opinions objected to on the same factual basis. Unsurprisingly, Novartis argues that both questions should be answered in the negative. The Court disagrees.

Novartis first contends that the opinions included in its motion to the MDL, but not carved out in the MDL orders, were not "definitively and unambiguously decided." (Def.'s Vogel Reply Br. at 3.) Essentially, because the MDL court denied the *Daubert* motions without specifically addressing in its orders every objection to every opinion that Novartis made in its motion papers, Novartis would have this Court review the reliability of a particular methodology or factual basis de novo. The Court rejects this argument for two reasons. First, to the extent Novartis required clarification or desired reconsideration of these issues, it could have raised them before the MDL court. That they were not raised suggests to this Court that Novartis is simply trying its hand with a different judge in hopes of changing the outcome. Second, as noted below in the section discussing the current motions to exclude certain opinions of Drs. Vogel, Skubitz, and Marx, the MDL specifically carved out the expert opinions excluded

from its rulings on the ground that they were not relevant to the summary judgment motion. It would logically follow that, by carving out the non-relevant opinions, the MDL court considered all of the other opinions relevant to the summary judgment motion, and therefore subject to its *Daubert* determination.

The second argument that Novartis puts forth is that, even if the MDL's orders constituted the "law of the case" on the relevant opinions, the law of the case doctrine is discretionary and "does not apply if disregarding a prior ruling would not cause prejudice to the party seeking the benefit of the doctrine." (Def.'s Vogel Br. at 3 (citing *Prisco v. A & D Carting Corp.*, 168 F.3d 593, 607 (2d Cir.1999)).) This is a mischaracterization of the law of the case doctrine, which, as set forth below, is equally applicable, if not more so, to decisions by an MDL transferee court.

It is well-established that "[o]rders issued by a federal transferee court remain binding if the case is sent back to the transferor court." *In re Zyprexa Prods. Liab. Litig.*, 467 F.Supp.2d 256, 273 (E.D.N.Y.2006) (citing *Manual for Complex Litigation* § 20.133 (4th ed.2004)). As the Supreme Court has stated, the law of the case doctrine "posits that when a court decides a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983); *see also Aramony v. United Way of Am.*, 254 F.3d 403, 410 (2d Cir.2001). This doctrine is discretionary and a court "may depart from the law of the case for 'cogent' or 'compelling' reasons including an intervening change in law, availability of new evidence, or 'the need to correct a clear error or prevent manifest injustice.'" *Johnson v. Holder*, 564 F.3d 95, 99–100 (2d

Cir.2009) (quoting *United States v. Quintieri,* 306 F.3d 1217, 1230 (2d Cir.2002)).

In fact, it would be impossible to reconcile the contention by Novartis that a court can feel free to disregard the law of the case as long as the party seeking the doctrine's protection would not be prejudiced, with the Supreme Court's caution that "as a rule courts should be loathe to [revisit prior decisions in the case] in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would make a manifest injustice." *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 816, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) (citation omitted). In *Prisco,* the Second Circuit addressed the issue of whether a court that had a "valid reason" for reversing a previous ruling could still reverse that ruling if it would prejudice the party seeking the protection of the doctrine. Thus, whether the Plaintiffs would be prejudiced if this Court reversed the MDL court's rulings is only a relevant consideration if there is a "valid reason" for reversal. Novartis has failed to identify any "valid reason" for reversal. Novartis does not argue that the MDL court ruling was "clearly erroneous" or that "manifest injustice" would occur if the Court did not reverse the rulings.

Furthermore, any reversal of the MDL court rulings would undermine the purpose of the Multi District Litigation Act, which authorizes the coordinated and consolidated pretrial proceedings of civil actions involving one or more common issues of fact "for the convenience of parties and witnesses and [to] promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a). As stated in the initial order consolidating and transferring the Aredia and Zometa cases, "[c]entralization under Section 1407 is necessary in order to eliminate duplicative discovery; prevent inconsistent pretrial rulings; and conserve the resources of the parties, their counsel and the judiciary." *In re Aredia and Zometa Prods. Liab. Litig.,* 429 F.Supp.2d 1371, 1372 (Jud.Pan.Mult.Lit.2006). To prevent inconsistent pretrial rulings on the admissibility of expert testimony, it is only in "exceptional cases, [that] the federal or state court to which an MDL case is transferred or remanded may revisit a transferee court's decision." *Zyprexa,* 467 F.Supp.2d at 274 (E.D.N.Y.2006) (citing *Manual for Complex Litigation* § 20.133 ("Although the transferor judge has the power to vacate or modify rulings made by the transferee judge, subject to comity and 'law of the case' considerations, doing so in the absence of a significant change of circumstances would frustrate the purposes of centralized pretrial proceedings.")). Reversing or otherwise undermining the decisions by the MDL court could lead to the type of inconsistent pretrial rulings that Congress sought to avoid, and therefore frustrate the very purpose of consolidation.

Accordingly, the Court will not decide any issues previously presented to and denied by the MDL court. However, in an abundance of caution, the Court will address one of Novartis' main arguments against the admissibility of certain expert opinions, namely whether an opinion based on a non-controlled trial or study is reliable.

### C. *Reliability of Epidemiologic Studies*

A common objection that Novartis makes throughout the various motions is that an expert's opinion is unreliable because it is not based on the results of a randomized controlled clinical trial or study. These same objections were made in the MDL court motions, and in most instances with regard to the same studies and articles challenged in the instant mo-

tions. (*See, e.g.,* Def.'s Vogel MDL Br. at 13 ("To the extent Dr. Vogel relies on any larger studies, those studies have no control group and fail to control for confounding. Without controlled human data, it is not possible to know whether the occurrences of ONJ are more common in patients taking Aredia and/or Zometa than in the general population."); Def.'s Skubitz MDL Br. at 13 (seeking two exclude Dr. Skubitz's causation opinions based on three retrospective non-controlled studies, Hoff, Dimopoulos, and Cafro, that are also challenged as unreliable in the present motions).) As previously stated, the Court finds the MDL rulings on the admissibility of opinions premised on these studies constitutes the law of the case.

However, assuming the MDL court ruling cannot be read so broadly, the Court still finds that the early stage of research on BRONJ, the difficulty in performing a randomized controlled clinical trial or study, and the dispute among the various experts with regard to the importance of controlling for certain factors, support the admissibility under *Daubert* of the challenged opinions. This does mean the Court has not considered Novartis' other objections as they relate to the reliability of these articles—*e.g.,* failure to define ONJ or expert opinions that are inconsistent with a study's conclusions. However, to the extent Novartis' argues that an opinion is inadmissible because it relies on a retrospective non-controlled study, the Court finds that these arguments go to the weight and not the admissibility of the opinions.

To study the relationship between bisphosphonate drugs and ONJ, researchers rely primarily on epidemiologic studies. "Epidemiology is the field of public health and medicine that studies the incidence, distribution, and etiology of disease in human populations." Michael D. Green et al., *Reference Guide on Epidemiology,* in Reference Manual on Scientific Evidence 333, 335) (Fed.Jud.Ctr.2d ed.2000) (hereinafter *"Reference Manual"*). The medical field that performs epidemiologic studies as they relate to "the study of the utilization and effects of drugs in large numbers of people" is referred to as pharmacoepidemiology. See International Society for Pharmacoepidemiology, About Pharmacoepidemiology, http://www.pharmacoepi.org/about/index.cfm (last visited March 7, 2011. Expert opinions in medical-related cases typically involve results from clinical trials, epidemiologic studies, and case studies. The clinical trial is the "gold standard" of medical research. *In re Rezulin Prods. Liab. Litig.,* No. MDL 1348, 369 F.Supp.2d 398, 406 (S.D.N.Y.2005) (citing *Reference Manual* at 335). To date, there have been a limited number of clinical trials that have produced meaningful data. In the initial Aredia and Zometa clinical trials, there was no common definition for BRONJ and researchers were not necessarily looking for BRONJ. As such, a disputed issue in this litigation is how many instances of ONJ actually occurred in those clinical trials. *See infra* Section D.8.b. Dr. Salvatore Ruggiero, one of the original BRONJ researchers, who is also one of Plaintiff Deutsch's non-retained experts, has explained that, putting together the type of randomized controlled study to get definitive data on causation is particularly difficult in this case, because drugs such as Zometa and Aredia are considered a standard form of care for many patients with breast cancer or multiple myeloma. (Ruggiero Dep. 77–78.) In *In re Fosamax Products Liability Litigation,* 645 F.Supp.2d 164 (S.D.N.Y.2009), the court faced similar issues with the lack of controlled studies on the association between an oral bisphosphonate drug and the development of ONJ. There, the court held that

Considering the early state of the research, the lack of evidence from controlled epidemiological studies is not fatal. Under *Daubert*, an expert need not base his or her opinion on the best possible evidence, regardless of availability, but upon "good grounds, based on what is known."

*Id.* at 178 (quoting *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786). Accordingly, the fact that a particular opinion is not based on a randomized controlled clinical trial, while certainly an area for cross-examination, will not affect its admissibility.

Where, as here, there is limited research from clinical trials, and what is available is heavily disputed, observational epidemiologic studies are often used to assess an association between a drug and disease and in turn general causation. *Reference Manual* at 406 & nn. 55–57. Although epidemiology does not directly address the question of causation, the results of epidemiologic studies can be "highly probative on the issue of causation." *DeLuca by DeLuca v. Merrell Dow Pharm., Inc.,* 911 F.2d 941, 958 (3d Cir.1990). The two main types of observational epidemiologic studies are case-control studies and cohort studies. *Reference Manual* at 339. One of the Plaintiffs' experts, Prof. Wayne Ray, explained in his expert report how causation can be determined from observational studies as follows:

The term observational comes from the fact that, unlike randomized clinical trials, patients in observational studies are not assigned to the study groups. Rather, clinical investigators observe differences between patients who either use or do not use a particular medication. Because the patients in observational studies are not randomly assigned to the study groups, the findings from epidemiologic studies are sometimes referred to as associations. This simply implies that the disease of interest occurs more frequently in patients with the factor under study than in other patients.... Epidemiologists thus have developed procedures for determining whether or not an observed association is likely to be causal.

(Ray Rev. Report at 9.)

A cohort study "usually work[s] by classifying a population into those who have exposure to the drug (the exposed group) and those who do not (the control group.)" (*Id.* at 12.) The researcher then follows both groups for a specified length of time and then compares the propositions of individuals in each group who develop the disease. *Reference Manual* at 340. The observed result is referred to as the "association" between the drug and the disease. The strength of an association between exposure and the disease can be statistically stated in a measurement of association that examines the degree to which the risk of the disease increases when individuals are exposed to an agent. *Reference Manual* 348. For example, the association can be calculated in terms of "relative risk" and "attributable risk." The relative risk is the ratio of the incidence rate of disease in exposed individuals to the incidence rate of unexposed individuals. *Id.* at 348. The relative risk is "the standard measure clinical researchers use to describe the magnitude of occurrence of health effects associated with medications or other exposures." (Ray Rev. Report at 13.) "The threshold for concluding that an agent was more likely than not the cause of an individual's disease is a relative risk greater than 2.0." *Reference Manual* at 384. The attributable risk, which can be calculated using the relative risk, is the proportion of disease cases that are attributable to the exposure. (Ray Rev. Report at 14.)

By contrast, a case-control study measures and compares the "frequency of expo-

sure in the group with the disease (the "cases") and the group without the disease (the "controls")". *Reference Manual* at 340. The groups are then compared in terms of past exposure, and if a certain exposure is associated with or caused the disease, then "a higher proportion of past exposure among the cases than among the controls would be expected." *Id.* at 342.

When assessing the reliability of a epidemiologic study, a court must consider whether the study adequately accounted for "confounding factors." A confounding factor involves a situation where "both a risk factor for the disease and a factor associated with the exposure of interest" are present in the same study, and the study does not separate the effects of the two processes. *Id.* at 389. The distortion created by confounding factors can lead to an erroneous result. *Id.* As a result, there are a number of ways to control for known confounding factors. However, failure to control for an unknown confounding factor does not necessarily render the results unreliable.

In the instant case, Novartis objects to the reliability of the observational studies because many of them fail to control for alleged confounding factors such as cancer type, or other known risk factors associated with BRONJ, such as other cancer therapies and tooth extractions. In order to be considered a "confounding factor" the risk of an IV BP user developing ONJ with the risk factor must be substantially different than the risk of developing ONJ without the risk factor. *See id.* at 373. The Plaintiffs' experts do not assert with any degree of certainty that such risk factors are not confounding factors. Indeed, as the *AAOMS 2009 Position Paper* indicates, further research is needed to develop valid BRONJ risk assessment tools. *AAOMS 2009 Position Paper* at 10. As the MDL court noted, one of the myriad of

factual issues that the jury will need to decide is "whether there are, in fact other 'risk factors' for ONJ and what those are." *MDL Warnings Order* at 3. As the testimony of the Plaintiffs' experts and the relevant medical literature suggest, it is at least plausible that a study that does not control for a certain factor is still a reliable basis for an opinion.

For example, as reviewed in greater detail within the discussion of Novartis' *Daubert* motion to exclude the testimony of Prof. Ray, he performed a type of analysis that required a review of a number of cohort studies, many of which are relied upon separately by other experts in this litigation. Novartis argued that because the various cohort studies did not control for all of the confounding factors, and that Prof. Ray's analysis did not control for such factors, the results were inherently unreliable. However, Prof. Ray concluded that it was not necessary to control for these factors in order to determine the relative risk of bisphosphonate therapy because there is no evidence that these conditions cause ONJ absent bisphosphonate use. For example, Prof. Ray stated in his report that "if cancer were strongly associated with this rare condition, there should have been equal numbers of cases occurring prior to 2001–2002." (Ray Report at 32.) Prof. Ray also noted that the presence of other cancer therapies also "fails to explain the dramatic increase in cases that occurred following 2001" (*Id.* at 33).

Novartis disputes the accuracy of Prof. Ray's opinions because they are based on case-reports, but "mere weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility." *McLean v. 988011 Ontario, Ltd.,* 224 F.3d 797, 801 (6th Cir.2000) (internal quotation marks and citation omitted). In addition, another one of the Plaintiffs' experts, Dr. Keith

Skubitz, testified that it was not necessary to control for cancer type because, based on his conclusion, IV BPs "could cause ONJ whether or not one had cancer" because "the type of cancer presumably is not the mechanism of the ONJ, so it wouldn't matter the type of cancer." (2/16/09 Skubitz Dep. 319:9–320:2.) Highlighting the disputed nature of this position, Novartis' counsel responded to Dr. Skubitz by stating: "I understand you presume it's not the mechanism of ONJ. Other people might differ with you on that." (*Id.* at 320:3–5.)

Furthermore, the position that cancer type or certain risks may not be strongly associated with the development of BRONJ or that the ability to make such a determination remains unknown is also supported in the relevant medical literature. *See, e.g., AAOMS 2009 Position Paper* at 5 ("[A] few current studies have noted an increased risk of BRONJ among patients exposed to chemotherapeutic agents. . . . Others, however, have failed to confirm the association between chemotherapeutic agents and BRONJ risk."); Sundeep Khosla, et al., *Bisphosphonate–Associated Osteonecrosis of the Jaw: Report of a Task Force of the American Society for Bone and Mineral Research,* J. of Bone and Mineral Research, at 1483 (Nov. 10, 2007) ("Table 6 summarizes risk factors currently felt to predispose to bisphosphonate-associated ONJ; however, the task force recognized that the evidence on risk factors predisposing to ONJ was weak."); Aristotle Bamias, et al., *Osteonecrosis of the Jaw in Cancer After Treatment with Bisphosphonates: Incidence and Risk Factors,* J. of Clinical Oncology, at 8585 (Dec. 31, 2005) ("The difference in incidence between myeloma and breast cancer in our series is not significant and is most probably due to the different time of exposure between these groups."); *Id.* at 8586 ("Because of the diversity of the chemo-

therapy regimens and the timing of administration, it was impossible to perform an analysis addressing the contribution of this factor in the development of ONJ."); Thacharot Boonyapakorn, et al., *Bisphosphonate-induced Osteonecrosis of the Jaws: Prospective Study of 80 Patients with Multiple Myeloma and other Malignancies,* Oral Oncology, at 865 (2008) (identifying certain risk factors that had no significant association with ONJ such as age, sex, conventional chemotherapy, corticosteroids, thalidomide and time of exposure. and identifying a strong association with the history of extraction or surgical tooth removal during bisphosphonate therapy); *but see* Calhoun Decl. in Support of Novartis' *Daubert* Motion to Exclude the Testimony of Wayne Ray, Ph.D., Exs. 2(a)–2(k) (examples of articles regarding ONJ occurring absent bisphosphonate therapy).

The plausibility that an observational study is reliable despite not controlling for cancer type or other potential risk factors has been sufficiently established through the testimony of expert witnesses and the peer-reviewed medical literature. "That the research is accepted for publication in a reputable scientific journal after being subjected to the usual rigors of peer review is a significant indication that it is taken seriously by other scientists, *i.e.,* that it meets at least the minimal criteria of good science." *Daubert v. Merrell Dow Pharm., Inc. ("Daubert II"),* 43 F.3d 1311, 1318 (9th Cir.1995). Therefore, Novartis' objections to expert opinions on the grounds that they are unreliable because they rely on non-controlled epidemiologic studies or extrapolate opinions from articles based on different cancer types than those of Mrs. Deutsch and Mr. Napolitano will not affect the admissibility of such opinions. The weight of a conclusion derived from these studies involves the resolution of a factual dispute and therefore is

a classic question for the jury. *See Quiet Tech. v. Hurel–Dubois UK Ltd.*, 326 F.3d 1333, 1340–41 (11th Cir.2003) ("[I]t is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence.... By attempting to evaluate the credibility of opposing experts and the persuasiveness of competing scientific studies, the district court conflated the questions of admissibility of expert testimony and the weight appropriately to be accorded such testimony by a fact finder.") (internal citations and quotations omitted).

### D. Novartis' Daubert Motions to Exclude Portions of the Expert Testimony of Drs. Vogel, Skubitz, and Marx

■ As previously stated, the MDL court denied in part and mooted in part Novartis' *Daubert* motions to exclude the expert testimony of Drs. Vogel, Skubitz, and Marx. Specifically, the MDL court carved out from its decision the following issues that Judge Campbell deemed were not relevant to the summary judgment motion:

- "Dr. Vogel's opinions concerning the alleged corporate behavior of Novartis, his statement that the delay and failure in transmission of certain information impacted a large number of patients, or his testimony concerning the benefit of pretreatment dental screening" (Vogel Order at 3.)
- "Dr. Skubitz's opinions about extending the dosing interval for patients treated with Zometa or recommending that patients treated with Aredia and/or Zometa receive pre-treatment preventative dentistry to reduce the incidence of ONJ." (Skubitz Order at 3.)
- "... Dr. Marx's opinions concerning the alleged "bad faith" misconduct of Novartis or his opinions concerning the clinical trials." (Marx Litig.-Wide Order at 4.)

The arguments in the motions to exclude Drs. Vogel, Skubitz, and Marx's expert opinions before this Court fall into three categories. The first are objections that were raised in Novartis' submissions to the MDL court and which were subject to the MDL court's rulings. As previously stated, the Court considers the MDL court decisions the law of the case and will not revisit these issues. The second type of objection involves new arguments for excluding specific opinions in general areas of testimony subject to the MDL court's orders. Although the Plaintiffs' assert that these types of objections were implicitly decided by the MDL court, the Court will address the sufficiency of the arguments to the extent that doing so will not undermine the MDL court's decision. The final type of objection is to an issue that was either carved out by the MDL court, or not otherwise raised before the MDL court. The Court will address these objections the Court *de novo* to the extent that doing so is not inconsistent with the MDL court's other rulings.

### 1. The Experts and the Present Motions

#### a. Dr. Vogel

Dr. James M. Vogel has been a practicing physician in the field of hematology and medical oncology for the last 35 years. In addition, Dr. Vogel is presently an Associate Professor at the Mount Sinai School of Medicine in the Department of Medicine, Division of Hematology/Medical Oncology. In his practice, Dr. Vogel primarily sees patients with "solid tumors," predominantly breast and lung etiologies, and also sees patients with hematologic malignancies involving multiple myeloma, lymphomas and leukemias. At trial, the

Plaintiffs' seek to offer Dr. Vogel to testify on a number of subjects including: (1) Dr. Vogel's personal experience in prescribing bisphosphonate drugs and the clinical course of his patients that developed ONJ; (2) Dr. Vogel's experience with cancer patients who were not taking a bisphosphonate drug and whether they developed ONJ; (3) Dr. Vogel's opinion as to whether bisphosphonate drugs cause ONJ; (4) his opinion on whether Novartis adequately warned hematologists and medical oncologists of the risk of ONJ in patients who were prescribed intravenous bisphosphonate drugs, and whether Novartis possessed any information about this risk that should have been provided to the medical professionals; (5) whether the risk of ONJ could be reduced without reducing the efficacy of the drugs by using pamidronate rather than zoledronic acid, reducing the amount of drug exposures based on the dosing schedule, or reducing the frequency of drug usage; and (6) whether and which dental care strategies could be used to prevent or minimize ONJ in patients treated with intravenous bisphosphonates. (Vogel Report ¶ 8.)

Presently before this Court is Novartis' *Daubert* motion to exclude Dr. Vogel's opinions on five areas that Novartis contends were not addressed by the MDL court: (1) Novartis' corporate conduct in connection with the development and labeling of Aredia and Zometa, and publications regarding ONJ and Aredia and Zometa; (2) benefits of an individual receiving dental screenings prior to an individual's commencing Aredia or Zometa therapy; (3) the incidence of ONJ in persons exposed to bisphosphonates; (4) the information Novartis should disseminate regarding alternate dosing and the duration of treatment; and (5) the impact that the dosing mechanism of bisphosphonates has on bones. The Plaintiffs' contend that all of these opinions, with the exception of Dr.

Vogel's opinions on Novartis' corporate conduct and the benefits of pretreatment dental screening were already decided by the MDL court. The Court will now address below whether it considers itself bound by the MDL court as to a particular objection within its discussion of each objection.

### b. Dr. Skubitz

Dr. Skubitz is a Professor of Medicine at the University of Minnesota Medical School and conducts research on basic biological aspects of cancer and clinical cancer therapy in addition to treating patients in the oncology clinic. Dr. Skubitz also has extensive experience as a peer-reviewer and author of medical publications and has been involved in a multi-center trial using an antibody that inhibits osteoclast development to treat a rare bone tumor known as giant cell tumor of bone, or osteoclastoma. At trial, the Plaintiffs seek to offer Dr. Skubitz to testify on a number of subjects including: (1) his experience prescribing bisphosphonate drugs and the occurrence of ONJ in his patients; (2) his experience with regard to ONJ in patients who were not taking a bisphosphonate drug; (3) his opinion on whether there is a generally accepted understanding within the oncology community as to whether IV BP drugs cause ONJ in certain patients; (4) his opinion on whether the company had certain information about Zometa and Aredia that it did not disclose to the medical community and that would have been important to oncologists in making decisions about how to advise and treat their patients; and (5) his opinion on whether Novartis completely and accurately informed the medical community about the risk of ONJ in patients taking IV BP drugs and about ways to avoid or minimize that risk. (Skubitz Report ¶ 5.)

Presently before this Court is Novartis' *Daubert* motion to exclude Dr. Skubitz's opinions on the following areas that Novartis contends were not addressed by the MDL court: (1) opinions on the drafting and approval of the Zometa and Aredia labels; (2) opinions not stated in Dr. Skubitz's expert report or deposition testimony; (3) opinions on alternative dosing; and (4) the benefits of pretreatment dental screening. The Plaintiffs' contend that all of these opinions, with the exception of certain of Dr. Skubitz's opinions on dosing, the benefit of pretreatment dental screening, and the admissibility of opinions not in Dr. Skubitz's report were already decided by the MDL court. The Court will address below whether it considers itself bound by the MDL court as to a particular objection within its discussion of each objection.

### c. Dr. Marx

Dr. Robert Marx is a board certified oral and maxillofacial surgeon and the active Professor of Surgery and Chief of the Division of Oral and Maxillofacial Surgery at the University Of Miami Miller School Of Medicine. In his clinical practice at the University of Miami, Dr. Marx spends one day a week consulting with patients, and four days a week performing surgeries, including removal of benign and malignant tumors, reconstructive surgery, and treatment and removal of diseased or dead jawbone. Dr. Marx has published extensively on all aspects of the diagnosis and surgical treatment of maxillofacial diseases and disorders and is considered an authority on bone science and diseases of bone. Indeed, BRONJ was first identified and described in the medical literature in a textbook that Dr. Marx co-authored in 2002 called *Oral and Maxillofacial Pathology: A Rationale for Diagnosis and Treatment* (Quintessence Publishing Co.).

Dr. Marx contacted Novartis in July 2003 to discuss 36 cases of unexplained ONJ between late 1999 and July 2003 that he believed were attributable to bisphosphonates, particularly Aredia and Zometa. Subsequently, Dr. Marx submitted these findings to the Journal of Oral and Maxillofacial Surgery as a medical alert to notify the dental profession of BIONJ, which were published in the September 2003 edition. Although Novartis disputed Dr. Marx's findings, they continued to work with Dr. Marx to determine whether a causal connection existed. During this time Dr. Marx continued to extensively research the relationship between bisphosphonate therapy and BIONJ. Dr. Marx's relationship with Novartis terminated when he declined to include his name in an article on the subject because it failed to identify bisphosphonates as the cause of ONJ or recommended any serious prevention and treatment protocols.

At the trial, the Plaintiffs' seek to offer Dr. Marx to testify on a number of litigation-wide subjects including: (1) his clinical experience that made him aware of a causal relationship between bisphosphonates and ONJ and which led to his finding BIONJ is a discrete pathology; (2) the reasons that he has concluded that bisphosphonates are the sole cause BIONJ; and (3) steps that can be taken to prevent and treat BIONJ in individuals receiving bisphosphonate therapy. (Marx Report ¶ 14.)

Presently before this Court is Novartis' *Daubert* motion to exclude Dr. Marx's opinions on six areas that Novartis contends were not addressed by the MDL court: (1) that dental treatment measures are effective in preventing BIONJ; (2) that Novartis engaged in "bad faith" conduct; (3) certain patients in the clinical trials had BIONJ; (4) criticizing the clinical trials; (5) presenting general causation

testimony based on adverse event reports that Dr. Marx has not reviewed; and (6) the biological mechanism by which bisphosphonate drugs cause ONJ. The Plaintiffs' contend all of these opinions, with the exception of Dr. Marx's opinion that Novartis engaged in "bad faith" conduct or his opinions relating to the clinical trials were already decided by the MDL court. The Court will address below whether it considers itself bound by the MDL court as to a particular objection within its discussion of each objection.

### 2. Novartis' Motions to Exclude Opinions by Drs. Vogel, Skubitz, and Marx on the Benefits of Preventative Measures and specifically Pretreatment Dental Screening

Novartis seeks to exclude Drs. Vogel, Skubitz and Marx from testifying about the benefits of warnings or preventative measures such as pretreatment dental screening in reducing the risk of ONJ. Novartis mainly objects to their opinions on the benefits of preventative measures because the theory is speculative and based on unreliable non-controlled studies.

As an initial matter, Novartis contends that because Dr. Vogel is not a dentist or oral surgeon and is not otherwise an expert on bisphosphonates or ONJ, Dr. Vogel is not qualified to opine on the effects of pretreatment dental screening on the incidence of ONJ in persons exposed to bisphosphonates. However, "[u]nlike an ordinary witness ... an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert,* 509 U.S. at 592, 113 S.Ct. 2786; *see also Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290 (2d Cir.2008). To be qualified to testify on such a subject the Court must be satisfied that "the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Daubert,* 509 U.S. at 592, 113 S.Ct. 2786. Dr. Vogel's extensive experience as an oncologist and hematologist including treating patients with bisphosphonate therapy provides a reliable basis for his opinions on the benefits of preventative measures such as pretreatment dental screening.

With regard to the speculative nature of the theory, Novartis cites testimony from Dr. Marx's deposition where he stated "whether any particular patient would have developed ONJ, but then didn't develop ONJ because of some sort of prebisphosphonate treatment dental exam, that's an unknowable situation at this point" and that "the jury is still out in terms of controlled data on this issue." (5/26/09 Marx Dep. at 1367–68.) According to Novartis, any opinions expressed by Drs. Vogel, Skubitz, or Marx as to the potential benefit of preventative measures that contradict Dr. Marx's statement are inadmissible. However, *Daubert* does not require absolute certainty before an expert can proffer an opinion and allows for the admissibility of new theories provided they are based on a reliable methodology. *See In re Baycol Prods. Litig.,* 532 F.Supp.2d 1029, 1066 (D.Minn.2007) ("Other courts have recognized that science is constantly evolving, and the fact that a theory is new or in the process of becoming generally accepted does not prevent its admission in court.") (citing *Ruiz–Troche v. Pepsi Cola Puerto Rico Bottling Co.,* 161 F.3d 77, 85 (1st Cir.1998)). Indeed, none of the experts claim that it is a scientific certainty that preventative measures, such as pretreatment dental screening, reduce the risk or incidence of ONJ. Rather, they all opine that the relationship is supported in the literature, and in Dr. Marx's case, by his own experience. The fact that an expert witness speaks in probabilities, rather than certainties, does not by itself make the

testimony unreliable. *See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of America Secs., LLC,* 691 F.Supp.2d 448 (S.D.N.Y.2010).

Consistent with the Court's earlier ruling, arguments as to the reliability of non-controlled studies go to the weight, not the admissibility of these experts' opinions on preventative measures. Furthermore, these experts' opinions are not wholly unsubstantiated observations, but rather this theory has been deemed plausible and credible in the relevant medical literature and through Dr. Marx's own published study. *See, e.g., AAOMS 2009 Position Paper* at 6 ("These findings suggest that, although BRONJ is not eliminated, dental evaluations, and treatment before initiating IV bisphosphonate therapy among cancer patients reduces ONJ risk."). The theory that preventative measures, including pretreatment dental screening, may decrease the risk of BRONJ is admissible and it is well within all of the experts field of expertise to opine on this subject. Accordingly, Drs. Marx, Skubitz, and Vogel's testimony satisfies the *Daubert* standard and Novartis' motions to preclude their opinions on the benefits of preventative pretreatment dental care are denied.

### 3. Novartis' Motions to Exclude the Opinions of Drs. Vogel and Marx on the Biological Mechanism for How IV BP Drugs Cause ONJ

As part of their causation opinions, Drs. Vogel and Marx opined on possible mechanisms by which bisphosphonates can cause ONJ. Notably, the experts discussed this theory in terms of its plausibility, not as a factual conclusion. "That the mechanism remains unknown does not mean that the one proposed by the [plaintiffs' experts] is not widely accepted as plausible." *Fosamax,* 645 F.Supp.2d at 183 (citing *In re Neurontin Mktg. Sales Practices and Prods. Liab. Litig.,* 612 F.Supp.2d 116, 149 (D.Mass.2009) (finding that biologic plausibility supported opinion on causation despite the fact that there was "robust debate in the scientific community" on the proposed mechanism); *In re PPA Prods. Liab. Litig.,* 289 F.Supp.2d 1230, 1247 (W.D.Wash.2003) ("The fact that the mechanism remains unclear does not call the reliability of the opinion into question.")). As such, the Court agrees with the court in the *Fosamax* litigation that "any testimony about the mechanism is admissible only if qualified in substance with a statement that it remains a theory that, subject to testing, may be proved or disproved." *Fosamax,* 645 F.Supp.2d at 198.

Novartis challenges the qualifications of Drs. Vogel and Marx, who are not bone experts, to reliably opine specifically on the theory that ONJ is caused by bisphosphonates targeting bone by disabling osteoclasts and inhibiting resorption in the jaw. The Plaintiffs' respond that, not only are Drs. Marx and Vogel qualified, but that these objections have already been raised to and rejected by the MDL court. The Court finds that the MDL court ruled on Dr. Marx's qualification but not those of Dr. Vogel. However, in either event, both are qualified.

#### a. Dr. Marx

In its motion to exclude Dr. Marx's litigation-wide testimony, Novartis argued that Dr. Marx was not qualified to provide an opinion relating to the bone resorption mechanism. Insofar as this was not among the topics explicitly excluded from the MDL court's opinion, the admissibility of Dr. Marx's opinion on this subject is the law of the case. However, even if the MDL court's decision was not binding, the Court would still find that Dr. Marx is more than qualified to testify with regard to this theory. Dr. Marx has conducted research, published peer-reviewed articles,

and essentially served as an authority on the relationship between bisphosphonates and ONJ. The Court has no doubt that his academic involvement and extensive background in identifying, treating, and studying patients with ONJ qualifies him to render opinions on this subject. *See Fosamax*, 645 F.Supp.2d at 198 (denying a motion to exclude Dr. Marx's opinion on the mechanism that Fosamax was "toxic to bone because it kills or impairs osteoclasts").

### b. Dr. Vogel

With regard to Dr. Vogel's qualifications, Novartis asserts that this Court should exclude Dr. Vogel's opinions on the mechanism theory that BRONJ is caused by bisphosphonates targeting bone by disabling osteoclasts and inhibiting resorption in the jaw because Dr. Vogel admitted that "he cannot explain the mechanism by which bisphosphonates allegedly cause ONJ" and because Dr. Vogel is not a bone pathologist or bone biologist. In the Novartis *Daubert* motion to exclude Dr. Vogel's opinions to the MDL court, Novartis argued that Dr. Vogel's opinions were unreliable because he admitted that "he cannot explain the mechanism by which bisphosphonates allegedly cause ONJ" and because "both of the publications cited by Dr. Vogel to suggest possible mechanisms as to how bisphosphonates may cause ONJ cast doubt on his causation opinion." (Def.'s MDL Vogel Br. at 12.) Accordingly, while the MDL court did find that Dr. Vogel's inability to explain the mechanism did not render his opinions unreliable as to the biological mechanism generally, the MDL court did not directly address whether Dr. Vogel is qualified to offer an opinion on the particular hypothesis about bisphosphonates targeting the bone.

Nevertheless, the Court finds that Dr. Vogel's lack of expertise as a bone biologist or bone pathologist does not disqualify him from opining on a plausible causation mechanism involving how bisphosphonates target bone to cause BRONJ. Dr. Vogel does not purport to rely on such expertise as the basis for his opinion. (Vogel Rebuttal Report ¶ 16 (... "I am not an expert on bone physiology, but I base this opinion on two articles I have reviewed.").) "If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *In re Zyprexa Prods. Liab. Litig.*, 489 F.Supp.2d 230, 282 (E.D.N.Y.2007) (citing *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 80 (2d Cir.1997)); *Rupolo v. Oshkosh Truck Corp.*, No. 05–Cv–2978, 749 F.Supp.2d 31, 37, 2010 WL 2244386, at *4 (E.D.N.Y. June 01, 2010) ("In a product liability action, an expert witness is not strictly confined to his area of practice, but may testify concerning related applications; a lack of specialization affects the weight of the opinion, not its admissibility.") (internal quotation marks and citation omitted). Dr. Vogel is a qualified oncologist and hematologist and has substantial experience treating patients with bone metastases. The MDL court has accepted Dr. Vogel as an expert on bisphosphonates and the MDL court ruled that he is qualified to opine on the biological mechanism based upon the relevant medical literature. In addition, he is not proffering this opinion as the definitive mechanism, but rather for the proposition that it is a plausible mechanism that has been identified based on his professional understanding of the relevant literature. *See In re Pfizer Inc. Secs. Litig.*, No. 04–CV–9866, 2010 WL 1047618, at *6 (S.D.N.Y. March 22, 2010) (permitting testimony about a plausible hypothesis about a causation mechanism where the "hypothesis has been deemed plausible and credi-

ble in the relevant medical literature, and is well within [the expert's] field of expertise based on his training, experience, and history of publication").

Accordingly, the Court denies Novartis' motions to exclude Drs. Vogel and Marx's opinions on the specific biological mechanism involving the accumulation of bisphosphonates in bone.

### 4. Novartis' Motions to Exclude Dr. Vogel and Dr. Skubitz's Opinions on Labeling

In the context of seeking to exclude certain opinions by Dr. Vogel and Dr. Skubitz, Novartis consistently makes arguments with regard to whether Dr. Vogel and Dr. Skubitz are qualified to opine on the Zometa and Aredia labels, and whether they employed a reliable methodology in reaching those opinions. The MDL court specifically held that Dr. Vogel and Dr. Skubitz are qualified to opine on the accuracy of Novartis' warnings, which include the labels and other informational materials provided to the medical community. Novartis seemingly attempts to circumvent the MDL court's ruling by seeking to exclude opinions in the instant case that Dr. Skubitz and Dr. Vogel have not offered. The Plaintiffs' have not designated Dr. Vogel or Dr. Skubitz as label creation experts or FDA experts, nor do they hold themselves out to be FDA compliance or label creation experts. (*See* 04/02/09 Vogel Dep. at 285:18–21 ("Q. Do you hold yourself out as a labeling expert? ... A. No."); 2/16/09 Skubitz Dep. at 159:2–14 ("Q. Do you hold yourself out as a labeling expert? A. No. Q. So how do you have any expertise to comment on the appropriateness of these labels at all? A. I suppose that would get to what the purpose of the label is. The purpose of the label presumably would be to inform the prescribing physician [as to] relevant informa-

tion about the drug. So in that regard I would think, as a *prescribing physician.* I should have some expertise on something about what should or shouldn't be in such a statement.") (emphasis added).) Thus, to the extent Dr. Vogel or Dr. Skubitz attempt to render an opinion as to whether the labels or warnings were inadequate because they failed to comply with FDA regulations, that testimony is excluded.

However, this does not mean that Dr. Vogel and Dr. Skubitz cannot opine as to the adequacy of the labels from the perspective of oncologists and prescribing physicians. The Plaintiffs' do not have a claim of negligence per se and Novartis has not asserted that compliance with FDA regulations is determinative as to whether the label or communications are misleading.

Furthermore, the Court does not find Dr. Vogel and Dr. Skubitz's methodology for concluding that certain labels and warnings were false or misleading to be unreliable. Opining as to whether certain information was false or misleading does not require the type of scientific methodology outlined in *Daubert*. Both experts reached their conclusions by comparing facts in evidence with the content shown on drug labels and in the warnings, which is a commonly accepted methodology used by experts admitted to testify as to the accuracy of warnings. *See In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.,* No. MDL 1203, 2000 WL 876900 *12 (E.D.Pa. June 20, 2000) ("[T]he court cannot preclude their opinions comparing facts in evidence with the status of the content shown on the labeling of the diet drugs."). Accordingly, the Court denies Novartis' motions to exclude Dr. Vogel and Dr. Skubitz's opinions as they related to accuracy of the warnings and labels as long as they

confine their opinions to their expertise as oncologists and prescribing physicians.

### 5. Novartis' Motions to Exclude the Opinions of Drs. Vogel and Skubitz on the Incidence Rate

In their reports, Drs. Vogel and Skubitz both opine that Novartis' warnings were false and misleading because they failed to indicate that the incidence rate of ONJ in IV BP users was "generally five percent or above." (*See* Vogel Report ¶ 47; Skubitz Report ¶¶ 68–78.) This is in contrast to what Novartis represented and continues to assert, which is that the incidence rate is closer to one percent. Novartis contends that this opinion is unreliable because both experts rely on non-controlled studies and that Dr. Vogel's opinion is particularly unreliable because it is inconsistent with his personal experience and because he failed to consider two studies published after his initial report. Contrary to the Plaintiffs' contention, these objections to Dr. Vogel's opinions were not decided by the MDL court.

In support of their respective conclusions Dr. Vogel analyzes five studies, and Dr. Skubitz analyzes ten studies. Both experts refute the accuracy of at least one of the studies Novartis relies on for its one percent figure. The plausibility of this position is supported by the analysis presented in the *AAOMS 2009 Position Paper*, where, relying on similar articles, the authors stated that "[a]ccording to case series, case-controlled studies, and cohort studies, estimates of the cumulative incidence of BRONJ have ranged from .8% to 12%." *AAOMS 2009 Position Paper* at 4. Novartis does not claim that either Dr. Vogel or Dr. Skubitz failed to apply their own methodology in analyzing the various publications. That Dr. Vogel failed to consider articles published after his report was published, as with all of Novartis'

objections to the factual bases for Dr. Vogel and Dr. Skubitz's opinions on the incidence rate, go to the weight and not the admissibility of their testimony. *See Bouchard v. Am. Home Prods. Corp.*, No. 98–CV–7541, 2002 WL 32597992 at *7 (N.D.Ohio May 24, 2002) ("The Court is not convinced that Dr. Manges' methodology is faulty. If Bouchard believes that he did not examine sufficient evidence to support his opinion, or believes that he ignored evidence that would have required him to substantially change his opinion, that is a fit subject for cross-examination, not a grounds for wholesale rejection of an expert opinion.").

Furthermore, Novartis argues that the five percent incidence rate is inconsistent with Dr. Vogel's personal experience. However, Dr. Vogel testified at his deposition that his personal experience could not produce a statistically significant result as to the incidence rate of ONJ because of the small number of patients he treats. (04/03/09 Vogel Dep. at 370:2–8.) To the extent Novartis disagrees with the conclusions reached by Drs. Vogel and Skubitz, this is an avenue for cross-examination and not an appropriate basis for exclusion. Accordingly, Novartis' motions to preclude Dr. Vogel and Dr. Skubitz from opining that the incidence rate of ONJ was generally 5% or above are denied.

### 6. Additional Objections to Dr. Vogel's Report

#### a. Dr. Vogel's Opinions on Corporate Conduct

Novartis contends that Dr. Vogel's opinions on Novartis' corporate conduct in its response to reports of ONJ in patients receiving Aredia or Zometa, including with regard to the products' labeling, should be excluded because Dr. Vogel's opinions are based on non-scientific Novartis internal documents provided to him during the liti-

gation. Novartis contends that Dr. Vogel lacks any firsthand knowledge or expertise on corporate conduct and labeling, and that Dr. Vogel's opinions are inferences that a layperson could make from the same non-scientific internal Novartis documents.

Novartis asserts that there are five opinions that Dr. Vogel cannot "reliably substantiate" based on his review of documents provided to him by Plaintiffs' counsel including:

(1) that NPC misrepresented causation evidence; (2) that NPC referenced corticosteroids as potential risk factors for ONJ in the warnings on its label to misdirect "the focus of medical attention away from the jaw area"; (3) that NPC minimized the incidence rate of ONJ; (4) that ONJ occurs in a patient after fewer infusions of Zometa than of Aredia and/or that NPC knew and failed to communicate that information; and (5) that a decrease in the duration and/or dosing frequency of therapy decreases the incidence of ONJ or that NPC knew and failed to communicate that information.

(Def.'s Vogel Br. at 10 (citing Vogel Report ¶ 62).) As an initial matter, the Court notes that Novartis attempts to conflate Dr. Vogel's opinions on Novartis' corporate conduct with his opinions on general causation and the adequacy of the warnings. As previously stated, the MDL court has already ruled that Dr. Vogel is qualified under *Daubert* to opine on the accuracy of the Aredia and Zometa labels and that Dr. Vogel can opine on whether the information provided by Novartis to the medical community was false or misleading. However, the Plaintiffs incorrectly represent the scope of the MDL order by insisting that Dr. Vogel's opinions on corporate conduct are admissible because "corporate conduct and labeling go hand in hand."

While Dr. Vogel can opine on whether the labels or the conveyance of information was "false or misleading" the MDL court did not rule on whether his testimony was admissible as to what Novartis knew or the motivations for Novartis' conduct in preparing and presenting the warnings. If the MDL court intended its rulings on Dr. Vogel's testimony regarding the adequacy of warnings to apply to Dr. Vogel's opinions on corporate conduct, it would not have carved corporate conduct out of its ruling on the MDL Vogel *Daubert* motion.

In proffering opinions based on the Novartis internal documents, Dr. Vogel walks a fine line between testifying as to what information is reflected in certain documents, and testifying to what certain individuals at Novartis thought about the information and their motivations for characterizing the information in a particular way.

The Court agrees with Novartis that, to the extent Dr. Vogel seeks to opine on the "intent, motive, or state of mind, or evidence by which such state of mind may be inferred," such testimony is inadmissible. *AstraZeneca LP v. Tap Pharm. Prods., Inc.*, 444 F.Supp.2d 278, 293 (D.Del.2006); *In re Fosamax Prods. Liab. Litig.*, 645 F.Supp.2d 164, 192 (S.D.N.Y.2009) (granting a motion to exclude expert testimony "as to the knowledge, motivations, intent, state of mind, or purposes of the defendant], its employees, the FDA, or FDA officials" and noting that the expert conceded that her regulatory expertise "does not give her the ability to read minds"). Such testimony is generally held to be inadmissible because "the opinions of [expert] witnesses on the intent, motives, or states of mind of corporations, regulatory agencies and others have no basis in any relevant body of knowledge or expertise." *In re Rezulin Prods. Liab. Litig.*, 309 F.Supp.2d 531, 546 (S.D.N.Y.2004).

Dr. Vogel frequently expresses opinions on how certain employees reacted to particular studies, and although Dr. Vogel does not expressly state that certain statements indicate a certain intent, motive, or state of mind, such an inference can easily be made by a jury. For example, based partly on his review of internal documents, Dr. Vogel opines that Novartis included certain risk factors in its warnings that it knew were not significant in order to "misdirect[ ] the focus of medical attention away from the jaw area." (Vogel Report ¶ 62.) Stating that such information was done to "misdirect" implies an improper motive for Novartis' conduct and is impermissible.

However, whether Dr. Vogel can opine on Novartis' motive, intent, or state of mind is distinct from whether Dr. Vogel can opine on his interpretation of whether certain information contained in the Novartis internal documents indicated certain risks and whether such information would have been useful to doctors. In certain instances, Dr. Vogel's testimony may be helpful in defining complex or specialized terminology, or drawing inferences that may not be apparent without the benefit of experience or specialized knowledge. It may not be apparent to a layperson what type of information a doctor expects to receive from the company advertising a drug and what information they are expected to and are able to ascertain on their own. Furthermore, it may not be apparent to a layperson why including some risk factors and not others are misleading to a prescribing doctor. This is a matter of expertise that Dr. Vogel is qualified to engage in regardless of whether he has expertise in the inner workings of pharmaceutical companies or regulatory agencies. While it is true that some Novartis internal documents are capable of interpretation by a layperson, Dr. Vogel's testimony has been informed by the evidence as a whole, and therefore he should be permitted to testify as to what evidence he relied upon, even if some of those documents do not require expert knowledge. *See Olin Corp. v. Certain Underwriters at Lloyd's London,* 468 F.3d 120, 134 (2d Cir.2006) (holding that it was not reversible error for the trial judge to choose not to selectively exclude portions of the experts testimony that the court thought were not well supported, but rather consider the testimony as a whole).

Accordingly, the Court grants in part and denies in part Novartis' motion to exclude Dr. Vogel's testimony based on the Novartis internal documents. Dr. Vogel can opine on the medicine and science that was available at the time regarding the risks and benefits of Aredia and Zometa, and can compare that information to what was disclosed on the label or in other materials Novartis presented to the medical community. To the extent the information on the known risks is derived from internal Novartis documents, Dr. Vogel's scientific expertise is helpful to the trier of fact in understanding those documents. *See In re Baycol Prods. Litig.,* 532 F.Supp.2d 1029, 1064 (D.Minn.2007) (permitting expert opinion on the completeness or accuracy of a drug label based on the experts knowledge of the risks, but excluding the expert opinion on whether the labels complied with FDA regulations). However, Dr. Vogel may not explicitly or implicitly opine on the intent, motivations, or state of mind of Novartis or any Novartis employees. *See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of America Secs., LLC,* 691 F.Supp.2d 448, 467 (S.D.N.Y.2010) ("Although some of Weiser's deposition testimony walks a fine line between opining on what investors would customarily assume and what Plaintiffs actually did assume, so long as Weiser refrains from opining on the actual state of

mind of the Plaintiffs, his opinions on these matters are admissible.").

### b. Dr. Vogel's Opinion on a Reduced Dosing Schedule

Novartis seeks to exclude Dr. Vogel's opinion that "a reduced dosing schedule has shown equal efficacy and less risk." (Vogel Report ¶ 60.) A dose-response relationship is "[a] relationship in which a change in the amount, intensity, or duration of exposure to an agent is associated with a change—either an increase or a decrease—in risk of disease." *Reference Manual* at 390. Although Novartis' objections to Dr. Vogel's opinions on the dose-response relationship generally were rejected by the MDL court, Novartis did not object to this specific opinion in its MDL *Daubert* motion and therefore it is properly challenged in the instant motion.

Dr. Vogel's opinion is based on the results of the observational study by A. Corso, et al., *A Different Schedule of Zoledronic Acid Can Reduce the Risk of Osteonecrosis of the Jaw in Patients with Multiple Myeloma*, 21 Leukemia 1545 (2007) ("Corso study"). To the extent Novartis contends this study is an unreliable basis for Dr. Vogel's opinion because it only involves multiple myeloma patients or does not distinguish between individuals with various risk factors, those arguments go to the weight and not the admissibility of his opinion. However, Novartis asserts that, even if the Corso study were reliable, Dr. Vogel's opinion is unreliable because: (1) he is not qualified to interpret the results of the study; (2) he is not qualified to opine on what information Novartis should have provided to the medical community about dosing; and (3) he does not have an opinion on the on the threshold dose of Aredia or Zometa that would increase the risk of ONJ.

With regard to the first two arguments about Dr. Vogel's qualifications to interpret the study and to opine on what dosing information Novartis should have provided to the medical community, these issues were already addressed by the MDL court. In its ruling, the MDL court stated that Dr. Vogel was qualified to opine on whether the information provided to the medical community, including information on dosing, was false or misleading. Furthermore, the MDL court has also ruled on the admissibility of Dr. Vogel's opinions that are based on the relevant medical literature. As with the Corso study, many of the studies underlying Dr. Vogel's opinions were observational studies. Accordingly, the MDL court implicitly found Dr. Vogel qualified to interpret those studies, and the artful citing of deposition testimony by Novartis, taken out of context, does not require a reversal of that ruling.

However, Novartis also cites to a portion of Dr. Vogel's deposition testimony that occurred after the MDL proceedings that it argues shows that Dr. Vogel is unqualified to offer an opinion on the benefits of a reduced dosing regimen. Specifically, Novartis cites to a page of Dr. Vogel's deposition where he states that does not have an opinion on the threshold dose of Aredia or Zometa that would "increase the risk of ONJ." (01/07/10 Vogel Dep. at 78:5–17.) While this may be related to Dr. Vogel's opinion that a reduced dose can decrease the risk of ONJ, the Court cannot, without more, find that this undermines Dr. Vogel's opinion to the point of making it unreliable. *See, e.g., McClain v. Metabolife Intern., Inc.*, 401 F.3d 1233, 1241 n. 2 (11th Cir.2005) ("One should not conclude from this analysis that to pass *Daubert* muster an expert must give precise numbers about a dose-response relationship. Some ambiguity about individual responses is expected."). Dr. Vogel has been established as an expert who is qualified to

opine on the dose-response relationship generally and his extensive discussion of the studies supporting and questioning that relationship support the reliability of his opinions. The Court simply cannot determine from a sliver of deposition testimony, where it appears that Dr. Vogel begins to clarify his position, that this one statement undermines his entire opinion. Because the Plaintiffs' considered this issue decided by the MDL court, they did not address it in their opposition to the instant motion. Thus, although the Court denies the motion to exclude Dr. Vogel's testimony on the reduced dosing schedule, the Court will permit a motion in limine on this subject based on testimony occurring after the MDL court's decision.

### 7. Additional Objections to Dr. Skubitz's Report

#### a. Dr. Skubitz's Opinions on Dosing

Novartis seeks to exclude Dr. Skubitz's opinions on the dosing and ONJ relationship generally, the benefit of less frequent dosing as based on his review of the Corso study, and the benefit of less frequent dosing based on his own practice. The MDL court specifically carved out Dr. Skubitz's opinions "about extending the dosing interval for patients treated with Zometa." (Skubitz Order at 3.) However, this opinion is not clearly separated out in Novartis' submission to the MDL court, and therefore it is difficult for the Court to determine precisely which of Dr. Skubitz's opinions on dosing were already decided by the MDL court. Thus, in an abundance of caution, the Court will address all three of Novartis' objections.

#### i. Relationship between the Dose of Zometa and Aredia and the Risk of Developing BRONJ

With regard to the dosing regimen generally, Dr. Skubitz opines that the risk of ONJ increases with the cumulative dose of bisphosphonates (Skubitz Report ¶¶ 39–43) and that ONJ occurs with greater frequency and at a lower cumulative dose in patients treated with Zometa as compared with patients treated with Aredia (*Id.,* ¶¶ 68–78). Novartis contends that five of the publications that Dr. Skubitz relies upon cannot support a "clinically defensible and efficacious use for the products that would survive FDA approval or lead to anything but a hypothesis about whether and under what circumstances a different dosing regimen might benefit different groups of patients with bone metastases." (Def.'s Skubitz Br. at 7.) As to whether these articles support a use that would survive FDA approval, this is not the subject of Dr. Skubitz's opinion. His opinion is confined to what the publications reflect about the dosing regimen and whether the information provided to the medical community about the risks or benefits of different dosing regimens were false or misleading.

The Court notes that Dr. Skubitz relies on ten articles for the above stated opinions, and that the five articles Dr. Skubitz's cites for the contention that the risk of ONJ increases with the cumulative bisphosphonate dose are not the five articles Novartis argues are unreliable. Objections to these articles were presented with respect to Dr. Skubitz's causation opinions and were rejected by the MDL court. Thus, the Court sees no grounds to exclude Dr. Skubitz's opinion that the risk of ONJ increases with the cumulative bisphosphonate dose.

Finally, the Court does not find the five articles that Novartis claims are insufficient to support Dr. Skubitz's opinion that ONJ occurs with greater frequency and at a lower cumulative dose in patients treated with Zometa as compared with patients treated with Aredia to be unreliable. While Novartis continues to dispute the

adequacy of these articles, Novartis does not contend that the authors of these articles failed to follow their own methodology, or that Dr. Skubitz could not support his opinion based on the conclusions of these articles. Accordingly, the Court denies Novartis' motion to exclude Dr. Skubitz's opinions on the relationship between bisphosphonate drug dosing and ONJ.

### ii. Benefit of a Reduced Dosing Regimen based on the Corso Study

In addition to his opinions on dosing generally, Dr. Skubitz opines on the benefit of less frequent dosing based on the Corso study. Novartis argues that Dr. Skubitz's opinion is inadmissible because the Corso study is unreliable; he selectively relied on the outcome of a publication he preferred; and because he does not follow the same dosing regimen as that recommended in the Corso study. As previously discussed, the Court finds that the Novartis objections to an opinion on the benefits of reducing dosing based on the reliability of the Corso study because it is a retrospective non-controlled observational study limited to multiple myeloma patients, go to weight and not the admissibility of the opinion. Moreover, although the Corso study is the one Dr. Skubitz relies on specifically for the proposition that there is a benefit to less frequent dosing, Dr. Skubitz's opinion is also informed in part by the four articles he analyzed to determine that the risk of ONJ increases based on dosing.

The only new argument Novartis offers to undermine the reliability of an opinion based on the Corso study, is that ONJ is not defined in the Corso study. As Dr. Skubitz stated in his rebuttal report, "it is not necessary with a disease like ONJ to have a precise diagnostic test to recognize when a patient has the disease." (Skubitz Rebuttal Report ¶ 10.) Because Dr. Sku-

bitz does not claim that ONJ must be defined to render a study reliable, and he has opined as to why such a definition is unnecessary, the lack of definition of what constituted ONJ in the Corso study is not a fatal flaw.

As to whether Dr. Skubitz's opinion is unreliable because he primarily relies on the Corso study as opposed to other studies, the Court does not find this to be the type of "selective review" that would potentially undermine the reliability of an expert's opinion. In his rebuttal report, Dr. Skubitz addresses the study: Hind Hatoum, et al., *Zoledronic Acid and Skeletal Complications in Patients with Solid Tumors and Bone Metastases—Analysis of a National Claims Database,* 113 Cancer 1438 (2008) ("Hatoum study"), which Novartis and its experts contend undermine the Corso study and concludes that "[the Hatoum study] does not provide convincing evidence that 'monthly treatment is … more effective than less frequent administration of Zometa.'" (Skubitz Rebuttal Report ¶ 31 (citing the Dr. Lipton Report).) It is not the equivalent of a selective review if an expert reviews two publications and determines one to be more reliable than the other. At the end of the day, Novartis takes issue with Dr. Skubitz's conclusions, not his methodology. Here, Dr. Skubitz reviewed two studies, and based his opinion on the study he found to be more reliable. This is a reliable methodology under *Daubert.*

Finally, Novartis contends that the Court should exclude Dr. Skubitz's opinion because he admitted at his deposition that he does not follow the exact dosing recommendation from the Corso study—*e.g.,* Dr. Skubitz has never recommended a preextraction or post-extraction holiday from Zometa to any of his patients. However, as Dr. Skubitz stated in his rebuttal report, his current approach is "support[ed]"

by the Corso publication, not dictated by it. (*Id.*, ¶ 15.) There is no dispute that Dr. Skubitz is qualified to opine on the results of a published study. It does not undermine the reliability of his opinion on the results of the Corso study that Dr. Skubitz does not follow in practice the exact dosing regimen set forth in the Corso study. Furthermore, he does not need to propose an alternative dosing mechanism to opine on the potential benefits of a reduced dosing mechanism.

Thus the Court denies the motion to exclude Dr. Skubitz's testimony on dosing regimens, including the benefit of less frequent dosing, insofar as they relate to opinions premised on the relevant medical literature.

### iii. Dosing Opinions based on Personal Experience

Finally, Novartis contends that Dr. Skubitz should not be permitted to opine that a reduced dosing regimen has led to a lower incidence rate of ONJ in his own patients. In his rebuttal report, Dr. Skubitz states that he has reduced the term and frequency of bisphosphonate therapy with his patients and he "believe[s] it could be the reason [he has] seen so few cases of ONJ in [his] patients, and that [he] would be seeing many more if [he] were to adhere strictly to Novarts' dosing recommendations." (Skubitz Rebuttal Report ¶ 15.) Dr. Skubitz has not provided any data to support the reliability of this opinion nor indicated that he has followed a particular methodology beyond observation. Observation alone is "simply inadequate to support the conclusion[s] reached" that reduced dosing has lead to a decrease of ONJ in Dr. Skubitz's patients, and therefore "*Daubert* and Rule 702 mandate the exclude of [his] unreliable opinion testimony." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir.2002).

### b. Dr. Skubitz's Opinions Not Included in his Report

Novartis seeks to exclude three potential lines of testimony that were not included in Dr. Skubitz's report. Specifically, Novartis asserts that the Court should exclude any opinions by Dr. Skubitz as to the Aredia and Zometa labels prior to September 2003; as to whether the presence of osteopetrosis or pyknodysostosis should have alerted Novartis to an association between Zometa and ONJ; and whether phossy jaw is the same entity as ONJ. For their part, the Plaintiffs' contend that all of these opinions could be implied from Dr. Skubitz's expert report and that Novartis cannot claim surprise after they were given numerous opportunities to depose Dr. Skubitz on these opinions. However, even assuming such opinions were implied, Dr. Skubitz testified that he did not intend to offer opinions on any of these subjects.

Dr. Skubitz testified that he is not offering an opinion that the existence of jaw lesions in persons with osteopetrosis or pyknodysostosis should have alerted Novartis to the possibility that Zometa or Aredia might cause ONJ before 2002. (11/23/09 Skubitz Dep. at 152:5–23), Dr. Skubitz admits that he does not opine about what should have been included in the Aredia and Zometa labels prior to September 2003 (*Id.* at 215:11–15), and states he is not going to offer an opinion as to whether this information should have been communicated prior to September of 2003 (*Id.* at 216:9–14). Dr. Skubitz also explicitly states that he was not offering the opinion that ONJ and phossy jaw are the same disease. (*Id.* at 135:7–13.) Accordingly, the Court grants Novartis' motion to exclude the above referenced opinions specifically disclaimed by Dr. Skubitz.

However, although the Court is granting Novartis' motion, it is only as to the narrow set of opinions that Dr. Skubitz testi-

fied he would not render any opinions on. This decision is not to be read as a broad exclusion of all opinions implicating these subject matters. For example, although Dr. Skubitz stated he would not opine on whether the September 2003 or March 2004 labels should have included information regarding the incidence rate, this statement does not extend to any opinions on the ONJ incidence rate and when that information could have been determined from the literature. Finally, this opinion also should not be read to exclude any opinion expressed in a deposition that was not included in an expert report. To the extent such issues exist in other contexts, the parties may raise them at trial.

### 8. Additional Objections to Dr. Marx's Report

#### a. Dr. Marx's Opinions on "Bad Faith"

In ruling on Novartis' motion to exclude Dr. Marx's litigation-wide testimony, the MDL court declined to rule on whether Dr. Marx could testify as to Novartis' bad faith. It is unclear whether by seeking to exclude "bad faith" testimony, Novartis is seeking to exclude any testimony by Dr. Marx regarding his interactions with Novartis, or simply the specific statements that Novartis intentionally manipulated data and acted in bad faith. The Plaintiffs' argue that Dr. Marx should be permitted to testify about Novartis' efforts to control the conclusions of the advisory board it convened and which Dr. Marx was a part of, and the pressures Dr. Marx felt as one of the advisory board members to comport to Novartis' wishes. (Pls.' Marx Br. at 16.) The Plaintiffs' further contend that, based on Dr. Marx's testimony about his interactions with Novartis, "the jury can decide that NPC was acting in bad faith." (*Id.*)

To the extent that Dr. Marx seeks to offer the legal conclusion that Novartis acted in bad faith, even those that the Plaintiffs' argue are "rationally based on his perception of NPC's conduct which he personally witnessed" (*Id.* at 16), that testimony is impermissible and the Court grants Novartis' motion to preclude such testimony. *See United States v. Duncan,* 42 F.3d 97, 101 (2d Cir.1994) ("In evaluating the admissibility of expert testimony, this Court requires the exclusion of testimony which states a legal conclusion."). This holding does not preclude Dr. Marx from offering his expert opinion on what information was available based on the relevant medical literature and Novartis internal documents. However, in the context of expressing those opinions Dr. Marx may not comment on whether Novartis was acting in good faith or otherwise testify as to Novartis' intent, motivations, or state of mind.

In addition, this holding also does not preclude Dr. Marx from testifying as a fact witness about his experiences working with Novartis and Novartis employees. If, as the Plaintiffs' contend, Dr. Marx is offering this testimony to show what was known by Novartis and when Novartis knew it, not based on a review of scientific data but based on his own personal interactions, this is more consistent with the testimony of a fact witness. It is for the jury to decide whether Dr. Marx's experiences imply that Novartis was acting in bad faith.

#### b. Dr. Marx's Opinion on the Occurrence of BRONJ in the Clinical Trials

In its submission to the FDA Oncologic Drugs Advisory Committee ("ODAC") meeting in March 2005, Novartis informed the FDA that, based on its retrospective review of data from the clinical trials for Aredia and Zometa, they had identified six adverse events "consistent with a *potential* diagnosis of ONJ." (Def.'s Marx Br. at 9

(citing ODAC Submission at 21) (emphasis added by Novartis).) According to Novartis, the clinical investigators did not report any events as ONJ, but noted four cases of osteomyelitis. Novartis further contends that three of those cases of osteomyelitis that did not indicate exposed bone was present, were designated as "potential ONJ" because the definition of ONJ was unclear and ONJ cases occasionally were reported as osteomyelitis.

In this litigation, Novartis submitted an expert report by Dr. Eric Carlson, who reviewed the medical records of the six individuals identified as potential cases of ONJ in the ODAC Submission, and determined that none of the six individuals likely suffered from BRONJ. To counter this determination, Dr. Marx performed his own analysis and included his findings in his rebuttal report, concluding that "it is my opinion, based on my review of the medical records, that five of the six individuals likely suffered from bisphosphonate-induced osteonecrosis of the jaws." (Marx Rebuttal Report ¶ 18.) Dr. Marx stated it was "likely" and not certain because "the record was so incomplete that one could not draw any conclusion other than that of the examiner, who clearly had little or no dental training, that the patient had some mouth problem." (*Id.*, ¶ 19.)

Novartis contends that Dr. Marx did not apply his own definition or the AAOMS definition of ONJ in making these findings, and therefore they should be excluded under *Daubert*. For their part, the Plaintiffs' do not dispute that Dr. Marx failed to apply his own definition, but rather contend that his opinions are admissible because they are consistent with what Novartis told its multidisciplinary board at a meeting in Sydney, Australia in December 2005, which is that six patients in its study suffered from ONJ. In response, Novartis argues that it intends to make a motion in limine to exclude the summary from the Australia meeting, and that, regardless, Dr. Marx did not indicate in his rebuttal report that his opinion was based on the summary from the Australia meeting.

As an initial matter, the existence of this document from Australia is irrelevant to the Court's decision. Dr. Marx does not cite to the Australia document as the basis for his opinion, and the fact that he expressed a consistent opinion supports the plausibility of his position, but does not on its own establish reliability under *Daubert*.

Novartis' major dispute with Dr. Marx's methodology is that his designation of "likely ONJ" is unreliable because the records he reviewed did not indicate the individuals had exposed bone, which is central to his own definition of ONJ. It is undisputed that the records both parties are analyzing were made in 1999 or 2000, which "pre-dates the definition of bisphosphonate-related, bisphosphonate-associated, bisphosphonate-induced osteonecrosis by every organization that made a definition." (Marx Dep. at 1436:21–25). However, because exposed bone was not yet known to be a relevant indicator of BRONJ, the records would not necessarily reflect the presence or absence of exposed bone. Given these limitations, it was reasonable for Dr. Marx not only to consider whether exposed bone was noted on the chart, but also to look to other circumstantial evidence of BRONJ. Given that exposed bone may have been present but not recorded, it would be unfair to permit Novartis' experts to use the absence of a reference to exposed bone to conclude BRONJ was not present, and then preclude the Plaintiffs' from showing that the records contain other indicia of BRONJ that make it likely exposed bone was present, but not recorded. For example, in discussing chart number ZA–1041088, Dr. Marx notes that there is no record of

whether exposed bone was present, but "[t]he implied existence of a cutaneous oral fistula and the documentation of mandibular lesions even without exposed bone is very suggestive of BIONJ" and explains that "the reason no exposed bone was reported in the chart was that no oral examination was performed." (Marx Rebuttal Report ¶ 18(b).) While the Court finds that Dr. Marx may be overstating the results by concluding that these patients had "likely ONJ," Novartis is certainly free to cross-examine him on the strength of that statement and the accuracy of his results. Therefore, the Court denies Novartis' motion to exclude Dr. Marx's testimony on whether the individuals in the clinical trials had BRONJ.

### c. Dr. Marx's Opinions Criticizing the Clinical Trials

Novartis seeks to exclude Dr. Marx's opinions criticizing the clinical trial, such as in his rebuttal report where he opines that "[a]s a research matter, I found the records to be a serious deviation of proper research data recording and noted that jaw and mouth examinations were apparently not routinely performed as part of the trial." (Marx Rebuttal ¶ 17.) Novartis contends that Dr. Marx is unqualified to offer such an opinion because he is not an expert on clinical trials and because he is using 20/20 hindsight in criticizing the design and conduct of the trials. The Plaintiffs' contend Dr. Marx can testify about deficiencies in the trial based on his knowledge and experiences gleaned from treating patients. This argument is unavailing.

While Dr. Marx has substantial research and publication experience, there is no indication that he has even been involved in designing or monitoring a clinical trial. Although it is possible that some of Dr. Marx's criticisms are based on information that Novartis should have known at the

time the study was conducted, he is simply not qualified to opine on the adequacy of the clinical trials. Therefore, the Court grants Novartis' *Daubert* motion to exclude Dr. Marx's opinions criticizing the clinical trials. However, this decision does not mean that Dr. Marx cannot comment on the fact that certain information was not included in clinical trial records, or that certain examinations or surgeries were not performed during the clinical trial. Rather, it means that he cannot testify that certain records, examinations, or surgeries were required to be performed as part of the clinical trial.

### d. Dr. Marx's Causation Opinions Based on Adverse Event Reports

Adverse Event reports ("AE reports" or "AER") are submissions, usually by treating physicians or individuals, to the FDA or Novartis regarding patients who allegedly developed ONJ after being treated with Aredia or Zometa. Novartis contends that AE reports are inherently unreliable, and, even if Dr. Marx's opinions based on AE reports are admissible, the Court should exclude any opinions based on AE reports that Dr. Marx has not reviewed. Novartis raised these identical arguments to the MDL court. In fact, Novartis devoted a section in its memorandum of law in support of its *Daubert* motion to exclude the litigation-wide testimony of Dr. Marx entitled "Dr. Marx's methodology is unreliable because his causation opinions are based on anecdotal AE reports that he has never reviewed." (*See* Def.'s Marx Litig.-Wide MDL Br. at 11–12.) Except as to those issues carved out from its decision, of which this was not one, the MDL court accepted Dr. Marx's testimony on general causation. (MDL Marx Litig.-Wide Order at 3–4.) Therefore it is the law of the case that Dr. Marx may provide general causation opinions

based on AE reports, including those he has not seen.

Notably, it is important when making decisions on the admissibility of certain opinions to note the context in which they were made and the purpose for which they are being offered. Dr. Marx does not cite un-reviewed AE reports for their truth, but rather for the accepted theory that a vast number of reports contributes to the plausibility of causation. *See, e.g., In re Fosamax Prods. Liab. Litig.*, 645 F.Supp.2d 164, 185 (S.D.N.Y.,2009) ("The Court finds that the relatively high number of recent ONJ reports, almost exclusively involving bisphosphonate use, confirms the clinical experience of the PSC's oral maxillofacial experts, and adds to the reliability of their opinions."). Novartis may cross-examine Dr. Marx on the accuracy of that number, just as they did as his deposition. Accordingly, Novartis' *Daubert* motion to exclude Dr. Marx's causation testimony based on the un-reviewed AE reports is denied.

### E. Novartis' Motion Exclude the Expert Testimony of Prof. Wayne Ray

■ Professor Wayne Ray is a Professor of Preventative Medicine, Director of the Division of Pharmacoepidemiology and Director of the Master of Public Health Program at Vanderbilt University School of Medicine. Prof. Ray is an epidemiologist, and has been involved in pharmacoepidemiologic research for more than thirty years. Prof. Ray also serves as the Principal Investigator for the Vanderbilt Center for Education and Research on Therapeutics and as the Principal Investigator for a Contract with the FDA. In conjunction those duties, Prof. Ray is required to evaluate and design studies that determine whether or not there is evidence that a medication causes an adverse reaction. In his role as Principal Investigator for the

contract with the FDA, Prof. Ray frequently provides advice and performs studies on adverse medication reactions and assessments of the appropriateness of medication use.

Prof. Ray also has extensive experience with designing, executing and analyzing pharmacoepidemiologic studies. Although he has never published an article on ONJ, Prof. Ray has published 191 manuscripts, most of which contained the results of pharmacoepidemiologic investigations concerning the adverse and beneficial effects of medications. As a member of an ad hoc committee member of two FDA Advisory Committees he has provided expertise in study design methodology. In addition, Prof. Ray has served as a member of several national organizations where he has been tasked with evaluating the methodology of research studies.

The Plaintiffs' seeks to offer the expert opinion of Prof. Ray as to: (1) whether intravenous bisphosphonate drugs such as Zometa/Aredia increase the risk of ONJ and (2) whether there is a causal relationship between bisphosphonate drugs and ONJ. To determine whether Zometa/Aredia increased the risk of ONJ and if so, to what extent, Prof. Ray used a type of epidemiologic study referred to as a "meta-analysis." Prof. Ray then analyzed the causal relationship between IV bisphosphonates and ONJ by looking to case-reports and applying what is known as the Bradford Hill factors. The discussion of the Bradford Hill factors in part relied on the results of Prof. Ray's meta-analysis. Novartis seeks to exclude Prof. Ray's opinions, alleging that he is unqualified to offer the opinions in his report, that he failed to use a reliable methodology in reaching his conclusions, and that several of his opinions are inadmissible because they are either unsupported or were not included in his expert report. Before addressing

these objections, the Court deems it prudent to address the general reliability of the method of meta-analysis that provided the basis for Prof. Ray's opinions.

### 1. Meta–Analysis

When there are numerous epidemiologic studies that disagree or are small and lack the statistical power needed for a definitive conclusion, some experts may perform what is referred to as a "meta-analysis." *Reference Manual* at 380. A meta-analysis is defined as:

> [a] technique used to combine the results of several studies to enhance the precision of the estimate of the effects, size, and reduce the plausibility that the Association found is due to random sampling error. Meta-analysis is best suited to pooling the results from randomly-controlled experimental studies, but if carefully performed, it is also useful for observational studies.

*Id.* at 393. Performing a meta-analysis on cohort studies allows a researcher to determine the relative risk and the attributable risk to individuals of using a particular drug.

Novartis does not contend that meta-analyses in general are unreliable. Rather, Novartis objects to the reliability of using meta-analysis absent randomized controlled studies and the process by which Prof. Ray re-analyzed some of the underlying studies. While it is true that a meta-analysis using randomized controlled studies might provide the optimal result, it does not mean that a meta-analysis based on observational studies cannot produce a statistically significant result. *In re Paoli R.R. Yard PCB Litigation*, 916 F.2d 829, 857 (3d Cir.1990) ("There is some evidence that half the time you shouldn't believe meta-analysis, but that does not mean that meta-analyses are necessarily in error. It means that they are, at times, used in circumstances in which they should not be.") (internal quotation marks and citations omitted); *In re Bextra and Celebrex Marketing Sales Practices & Prod. Liab. Litig.*, 524 F.Supp.2d 1166, 1175–76 (N.D.Cal.2007) (crediting a meta-analysis of eight observational studies that showed no increased risk from Celebrex at 200 mg/d).

The Court is cognizant of the fact that a meta-analysis of cohort studies involves a number of problems potentially undermining its reliability. Although meta-analysis has the advantage of "pooling more data so that the results are less likely to be misleading solely due to chance," there is also the "problem with meta-analysis, particularly in meta-analysis of observational studies, is that the pooled studies often use disparate methodologies." *Id.* at 1174. In addition, the Court is also aware of the potential prejudice that can be caused by permitting expert testimony based on a meta-analysis. As explained in the *Reference Manual:*

> A final problem with meta-analyses is that they generate a single estimate of risk and may lead to a false sense of security regarding the certainty of the estimate. People often tend to have an inordinate belief in the validity of the findings when a single number is attached to them, and many of the difficulties that may arise in conducting a meta-analysis, especially of observational studies like epidemiologic ones, may consequently be overlooked.

*Reference Manual* at 381.

However, a meta-analysis based on observational studies, if performed by a qualified expert employing a reliable methodology, can produce a plausible finding. "An epidemiologic study that is sufficiently rigorous to justify a conclusion that it is scientifically valid should be admissible, as it tends to make an issue in dispute more

or less likely." *Id.* at 382. Under *Daubert,* an expert need not base his opinion on the best possible evidence, but upon "good grounds, based on what is known." 509 U.S. at 590, 113 S.Ct. 2786. Particularly where, as here, the results of the randomized controlled clinical trial are heavily disputed, and each of the cohort studies on their own may not be sufficient to establish causation, a meta-analysis of the available data is particularly useful to assist the trier of fact.

### 2. Prof. Ray's Opinions

**a. The Relative Risk and Attributable Risk of Developing ONJ as Between IV BP Users vs. Non Users and Short Term Users v. Long Term Users (the "Table 5 meta-analysis")**

In performing his Table 5 meta-analysis, Prof. Ray reviewed 26 cohort studies of IV bisphosphonate cancer patients with findings published between 2003 and 2008. Of the 26 studies, only 14 were included in the duration analysis because Prof. Ray found that they included "sufficient information to estimate incidence according to duration of therapy." (Ray Rev. Report at 23.) Prof. Ray then used a three month cut off point to create a control group. Based on his review, Prof. Ray noted that "[t]he case-series suggest that longer duration of use of IV bisphosphonates increases the risk of osteonecrosis of the jaw in cancer patients [because] this disease is thought to be related to higher cumulative doses of bisphosphonates and thus risk is lower, although not absent, in very short term users." (*Id.* at 22.) To control for the duration of therapy and the risk of developing ONJ, Prof. Ray employed a methodology where patients are used as their own control and he performed a person-years analysis to control for duration.

As part of his analysis, Prof. Ray reviewed the 14 cohort studies to determine the relative risk among cancer patients who used IV BP drugs for less than three months as compared to those who used it for more than three months. The three month temporal point was used as a proxy for non-IV BP use. Prof. Ray then calculated the incidence rate of ONJ in short and long term users, which included a person-years calculation. Prof. Ray performed a meta-analytic estimate of relative risk and found that the estimated relative risk for long-term versus short-term users was 9.44.

Prof. Ray also implemented a number of alternative analyses to test the number for robustness and performed two alternative calculations omitting certain studies that may have skewed the results. In addition, Prof. Ray calculated that the relative risk for IV BP users versus non users was 7.71/8.71 and that the attributable risk was 88.5%. Finally, Prof. Ray identified and refuted alternative explanations for his finding of a pronounced association between IV BP drug use and ONJ, including: (1) inconsistency with pivotal clinical findings; (2) publicity bias; (3) lack of consistency of case definition for ONJ; (4) confounding by cancer; (5) confounding by other cancer treatments. (*Id.,* at 30–33.)

**b. Relative and Attributable Risk of Developing ONJ Between Zoledronic Acid Therapy and Pamidronate Therapy (the "Table 6 meta-analysis")**

Prof. Ray also calculated the relative risk for users of zoledronic acid versus patients who used pamidronate. For this analysis, Prof. Ray used ten of the cohort studies that involved patients taking only one of the two IV BP drugs and which had information sufficient to calculate the proportion of patients who developed ONJ. Prof. Ray did not implement any controls for confounding factors or duration of exposure. Prof. Ray determined that the

relative risk estimates in the ten studies ranged from .5 to 18.3, and then performed a meta-analysis, finding that the relative risk for IV zoledronic acid was 2.5 times that for pamidronate users, and also that there is a marked dose-response between IV BP drug use and the risk of developing ONJ. To support the plausibility of the marked dose-response, Prof. Ray cited to the Corso study. Prof. Ray also discussed a case-control study that reported a 30–fold increased risk in using zoledronic acid to support his finding of the relatively high risk of using IV bisphosphonates, and specifically zoledronic acid.

#### c. Causation

After performing his meta-analyses, Prof. Ray identified three well-accepted ways to establish causality: (1) biological plausibility; (2) a pattern of case reports with no credible alternative explanations; and (3) a Bradford Hill analysis. Prof. Ray found that biological plausibility alone was insufficient to support a finding of causation. With regard to the case reports, Prof. Ray found that the substantial increase in case reports and adverse event reports submitted to the FDA and Novartis after the introduction of IV BP therapy, in conjunction with the lack of credible alternative explanations, supported causation. Finally, Prof. Ray conducted a review of the Bradford Hill factors and expressed a number of opinions in the course of analyzing the existence of those factors. A Bradford Hill analysis requires looking at nine criteria including: temporal relationship, strength of association, dose-response relationship, replication of the findings, biological plausibility, consideration of alternative explanations, cessation of exposure, specificity of the association, and consistency with other knowledge. With the exception of cessation of exposure, which Prof. Ray determined was not relevant, Prof. Ray found support for the existence of all of the factors either in the literature or based on his own meta-analysis estimates, and concluded that the Bradford Hill analysis supported a finding of causation.

#### 3. Novartis' Objections

Novartis asserts that: (1) Prof. Ray is unqualified to perform a meta-analysis; (2) Prof. Ray employed an unreliable methodology in conducting the Table 5 meta-analysis and therefore his Bradford Hill analysis is also unreliable; (3) Prof. Ray employed an unreliable methodology in conducting the Table 6 meta-analysis; (4) Prof. Ray employed an unreliable methodology in opining on causation based on case reports; (5) Prof. Ray is not qualified to opine on whether one "could have known" that bisphosphonates cause ONJ in 2003; (6) Prof. Ray is unqualified to opine on the incidence rate of ONJ or to make the assessment that ONJ is not "rare"; (7) Prof. Ray is unqualified to opine on the biological plausibility of bisphosphonates causing ONJ; and (8) Prof. Ray should be precluded from opining on the AZURE clinical trials and the effect of post-marketing data because these opinions were not included in his expert report.

#### a. Prof. Ray's Qualifications to Perform Meta–Analysis

Novartis argues that Prof. Ray is unqualified to offer opinions based on a meta-analysis because he has never published a meta-analysis study. The Court disagrees. That Prof. Ray has never published a meta-analysis is not equivalent to him never having performed such an analysis. Although inexplicably not provided to this Court, the New Jersey court in *Bessemer v. Novartis Pharmaceuticals Corporation,* No. MIDL–1835–08 (N.J.Super. Ct. April 30, 2010), who held an evidentiary hearing on the admissibility of Prof. Ray's opin-

ions, noted that at his February 20, 2009 deposition, Prof. Ray testified that he has used meta-analysis on numerous occasions throughout his career. (Pls.' Br., Ex. 3 at 6–7.) Prof. Ray has considerable experience spanning more than 30 years in designing, executing, and analyzing research studies on the adverse effects of medications, and his expertise in evaluating the methodology in others studies renders his crafting of this study and interpretation of the cohort studies particularly reliable. In addition, Novartis selectively quotes from Prof. Ray's deposition to make it appear as though he his is unqualified because he deviated from his usual practice of collaborating with a medical doctor or clinician. However, as Prof. Ray states in his deposition, he typically collaborates with a medical doctor or clinician when conducting original research, but "when it comes to the analysis of data or review of other studies, that's not so necessary." (2/21/09 Ray Dep. at 466–467.) Prof. Ray does not need to be an oncologist or a dental surgeon or any other type of medical doctor to analyze the data and studies for a relationship between a pharmaceutical drug and a disease. As a pharmacoepidemiologist, designing, executing, analyzing, and evaluating studies on this very subject is precisely Prof. Ray's area of expertise.

### b. Prof. Ray's Table 5 Meta–Analysis and Bradford Hill Analysis

Novartis contends that Prof. Ray's opinions on the relative risk and attributable risk of developing ONJ are unreliable because: (1) the three month cut point used in the meta-analysis was arbitrary and not supported by his source; and (2) he failed to control for the potential distorting impact of confounders such as tooth extraction and non-bisphosphonate therapies both statistically and through using an unreliable "patients as their own controls" methodology.

A cohort study requires a control group of non-exposed individuals as well as controls for confounding factors. To create the control group of non-exposed individuals, Prof. Ray established a temporal cut point for his analysis where three months or less of IV BP therapy was considered short term use, and over three months of IV BP therapy was considered long-term use. In addition, to prevent his results from being skewed by the fact that patients in the studies would not remain the same over the course of the analysis, Prof. Ray used a method whereby patients are used as their own controls. Novartis contends that the results of Prof. Ray's meta-analysis are unreliable because the three month cut point is unsupported by the literature, and using patients as their own controls is not an adequate method to account for patients changes in IV BP therapy and other risk factors over the course of the studies. Notably, although Novartis disputes the reliability of the three month cut point and the use of patients as their own controls, Novartis does not dispute the necessity of establishing a non-exposed and exposed group in conducting an epidemiologic analysis. Thus, Novartis is not objecting to the meta-analysis methodology of establishing a control group, but simply with the way that Prof. Ray chose to create that control group. While these objections may call into question the credibility of the study, the Court does not find unreliable the methodology employed by Prof. Ray. *Bextra*, 524 F.Supp.2d at 1184 ("All of plaintiffs' arguments go to the weight a trier of fact gives to the meta-analyses. Plaintiffs have not shown that the methods employed by Pfizer's experts are not based on good science.").

In addition, the three month cut point was based on an article discussing guidelines for dental procedures on patients beginning bisphosphonate therapy. Prof.

Ray testified that "in those guidelines, [the author] states that patients who have received no more than three months therapy may be considered the same as patients who have not used IV bisphosphonates," which provided the three month cut point to identify "[a] group of patients whose use was so short-term that they were in some sense equivalent to patients who had not used bisphosphonates." (2/20/09 Ray Dep. at 144:8–22.) Prof. Ray is qualified to evaluate a study and to extrapolate information to design a study. Novartis' objections to the three month cut point based on the literature go to the weight a jury gives to his analysis, not its admissibility.

With regard to the confounding factors, Novartis cites to portions of Prof. Ray's depositions where he admitted that certain factors such as tooth extractions, different types of cancer, and different types of cancer treatments might increase the risk of ONJ. Prof. Ray admits he did not control for these specific factors, and Novartis asserts that the patient as their own controls method did not adequately control for these confounding factors. With regard to using patients as their own control group, Prof. Ray explained:

Drugs such as the IV bisphosphonates present an interesting methodologic question. Because they are recommended care for certain diseases, most patients with these diseases will be receiving these drugs. How then can one conduct a cohort study when there are a limited number of nonusers to form a control group?

. . .

When this occurs, one standard practice is to use each patient as their own control, comparing different time periods. For studies of vaccine, where the adverse effects often are hypothesized to occur a short time following administration if in fact there is a causal relationship, the investigators will compare the period shortly following immunization with a more remote time period in which it is unlikely that the vaccine, taken some time ago, could have a causal role.

(Ray Rev. Report at 12.) Prof. Ray applied a type of methodology employed in studies where there are a limited number of nonusers available for the control group to identify "a control period in which risk due to the drug is likely to be small." (*Id.* at 25.) Based on his review of the literature and the case reports, Prof. Ray concluded that it was not necessary to control for these factors in order to determine the relative risk of bisphosphonate therapy because there is no evidence that these conditions cause ONJ without bisphosphonates. (*Id.* at 30–33.) Here, Prof. Ray satisfied his burden under *Daubert* by identifying the alternative causes and providing "a reasonable explanation for dismissing specific alternate factors identified by [Novartis]." *Israel v. Spring Indus.*, No. 98–CV–5106, 2006 WL 3196956, at *5 (E.D.N.Y. Nov. 3, 2006). Novartis' contention that Prof. Ray should have controlled for these factors goes to the weight that ought to be afforded to Prof. Ray's findings, not the reliability of his methodology.

In an extensive report Prof. Ray outlined the basis for meta-analysis generally, why it was applicable to studying the relationship between IV BP drugs and ONJ, and the methodology he employed. Prof. Ray addressed potential flaws in the study and how they impacted his findings and considered the reliability of his findings in light of alternative explanations and case reports. Furthermore, Prof. Ray submitted a Rebuttal Report, addressing many of the objections raised by Novartis in the instant motion. Prof. Ray's opinions, while based on a form of analysis not universally accepted and subject to criticism, are far from baseless speculation.

Prof. Ray's experience with designing and analyzing epidemiologic studies, and evaluating their sufficiency, supports the plausibility and reliability of his conclusions.

Accordingly, the Court denies Novartis' motion to exclude Prof. Ray's opinions on the relative risk of developing ONJ through IV BP use as reflected in the Table 5 meta-analysis. In addition, because Novartis' objections to Prof. Ray's attributable risk calculation and Bradford Hill causation analysis are premised on the alleged unreliability of his relative risk calculation, the Court also denies Novartis' motion to exclude Prof. Ray's opinions on those subjects as well. *See McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir.1995) ("Disputes as to the strength of his credentials, faults in his use of differential etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony."); *In re Pfizer Inc. Secs. Litig.*, No. 04–CV–9866, 2010 WL 1047618, at *7 (S.D.N.Y. March 22, 2010) ("Plaintiffs' critiques of Dr. Wei's choices regarding which trials to include in his own meta-analysis, the origins of the data he used, the date at which he undertook his meta-analysis, and at whose behest he performed his analysis all go to the weight of Dr. Wei's testimony.").

### c. Prof. Ray's Table 6 Meta–Analysis

Novartis further contends that Prof. Ray was unqualified to perform and did not employ a reliable methodology in performing his Table 6 meta-analysis where he found that there is an increased risk of ONJ in patients treated with zoledronic acid as compared to those treated with pamidronate. Although the Court finds Prof. Ray was qualified to perform such an analysis, the Court ultimately agrees that Prof. Ray failed to employ a reliable methodology.

Prof. Ray stated in his report that "duration of therapy is associated with increased risk" (Ray Rev. Report at 26), and he controlled for the passage of time in his Table 5 meta-analysis by doing a "person-years analysis." However, Prof. Ray did not employ a person-years analysis to control for duration in performing the Table 6 meta-analysis. Having concluded that duration of therapy increases the relative risk of ONJ, it would contradict Prof. Ray's own methodology if he failed to control for duration in the Table 6 meta-analysis. Prof. Ray does not deny that failing to account for duration would skew his results, but rather contends that a person-years analysis was not necessary because the fact that pamidronate was on the market prior to zoledronic acid means that patients receiving zoledronic acid were "likely to have a shorter duration of therapy," which provided a duration control. (Ray Rev. Report at 26; 2/20/09 Ray Dep. at 308.)

Prof. Ray does not cite any source for the presumption that the length of time a product has been on the market is a reliable substitute for duration of therapy, or any other source indicating that patients receiving zoledronic acid have a shorter duration of therapy. In addition, at least two of the studies Prof. Ray relies on in performing his analysis directly contradict this presumption. (*See* 2/21/09 Ray Dep. at 643; 9/12/09 Ray Dep. at 237–38.) Instead, Prof. Ray relies on the fact that other studies have reached the same conclusion regarding zoledronic acid.

However, Prof. Ray is not proffering his expert opinion based on his review of the literature, but is providing a relative risk number based on his own statistical analysis. As previously stated, there is strong risk of prejudice if a Court permits testimony based on an unreliable meta-analysis because of the propensity for juries to

latch on to the single number. Whether there is any factual basis for this presumption is crucial to the reliability of his analysis because, as Prof. Ray agreed at his deposition "if [his] assumption about pamidronate users generally being on pamidronate longer than zoledronic acid users [was] actually the other way around, then [his] analysis that's reflected in Table 6 is inaccurate." (2/20/09 Ray Dep. at 313.) As the Second Circuit has stated "[i]n deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir.2002). Even where the expert's methodology is reliable for some purposes, the court must determine whether it is a reliable way to draw a conclusion regarding the particular matter to which the expert testimony was directly relevant. Expert testimony that is merely subjective belief or unsupported speculation should be excluded. *R.F.M.A.S., Inc. v. So*, No. 06–CV–13114, 748 F.Supp.2d 244, 248–49, 2010 WL 4341331, at *2 (S.D.N.Y. Oct. 12, 2010).

Prof. Ray "was unable to point to any studies or, for that matter, anything else" to support his conclusion that the patients taking zoledronic acid in the studies he relied upon had a shorter duration of therapy than those taking pamidronate. *Ruggiero v. Warner–Lambert Co.*, 424 F.3d 249, 252 (2d Cir.2005). Because Prof. Ray admitted that controlling for duration is necessary for his methodology, and the Court finds that there is no factual basis to support his implementation of that control, the Court grants Novartis' motion to exclude Prof. Ray's opinion that there is a higher risk of developing ONJ through the use of zoledronic acid. *See Amorgianos*, 303 F.3d at 268–69 (affirming the district court's rejection of expert testimony where the expert did not follow his own methodology by failing to include certain variables in his analysis that he admitted would be considered in a proper assessment of the subject of his testimony); *see also In re Zyprexa Prods. Liab. Litig.*, No. 04–MD–1596, 2009 WL 1357236, at *2 (E.D.N.Y. May 12, 2009) ("Subjective or intuitive guesswork, as well as testimony that is insufficiently connected to the facts of the case, are grounds for rejection of a proffered expert's testimony.").

### d. Prof. Ray's Causation Opinion Based on Case Reports

Novartis objects to Prof. Ray's use of case reports and AE reports to support an inference of causality based on his meta-analysis. First, the Court notes that the same objections were raised in the MDL court as to Dr. Marx and others reliance on case reports and AE reports, and that these objections were rejected. However, putting the MDL court's ruling aside, the Court still finds that Prof. Ray may rely on the existence of the case reports and the AE reports, even those he has not personally reviewed. Prof. Ray is not relying on the truth of what is contained in these reports, but rather the significance of the increase in the reports absent any alternative explanation. Accordingly, the Court denies Novartis' motion to exclude Prof. Ray's causation opinions based on case reports and AE reports.

### e. Prof. Ray's Opinion that the Conclusion that IV BP Therapy Causes ONJ "Could Have" been Reached in 2003

Prof. Ray asserts in his report that Novartis "could have" reached the conclusion in 2003 that IV-bisphosphonates cause ONJ in cancer patients. Novartis primarily objects to this opinion because none of the studies in Prof. Ray's meta-analysis were published before 2003, and because causation has not been definitively estab-

lished. As previously stated, the fact that causation has not been proved to a scientific certainty does not prevent experts from opining on the likelihood of causation. In addition, Prof. Ray does not purport to rely on the cohort studies from his meta-analyses for this opinion. Rather, Prof. Ray basis this opinion on an initial report prepared by one of the Plaintiffs' other experts, Dr. Marx, that reported 36 cases of BRONJ in September 2003, (Ray Rev. Report at 36) and on the increase in case reports and adverse event reports for which he finds there is no credible alternative explanation (*Id.*). Having already found Prof. Ray's causation opinions based on case reports to be admissible, and in light of the liberal standard of admissibility, Novartis' motion to exclude Prof. Ray's opinion that Novartis "could have" reached the conclusion that IV-bisphosphonate therapy caused ONJ in 2003 is denied. As previously noted, "mere weaknesses in the factual basis of an expert witness' opinion ... bear on the weight of the evidence rather than on its admissibility." *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir.2000) (internal quotation marks and citation omitted).

### f. As to Prof. Ray's Opinion on the Incidence Rate

Prof. Ray opined in his rebuttal report that ONJ "is not a rare condition" and the incidence rate of ONJ was "approximately 5%." (Ray Rebuttal Report 32–33.) Prof. Ray's opinion is premised on the fact that 5% was the median incidence rate based upon his analysis of 26 cohort studies of patients treated with IV BP drugs. Novartis argues that Prof. Ray's opinion is unreliable because each of the studies Prof. Ray relied upon were flawed and because he failed to consider more recent studies that have concluded the incidence rate is 1.5%. As previously·discussed, Novartis' objections go to the weight and not

the admissibility of Prof. Ray's opinion on the incidence rate, and therefore Novartis' motion to exclude Prof. Ray's opinion on the incidence rate is denied.

Furthermore, Novartis argues that Prof. Ray should not be permitted to describe something as "rare" when "rare" is not a scientifically defined term. The Plaintiffs' do not provide a response as to why Prof. Ray's use of the word "rare" is admissible.

The Court finds that Prof. Ray may not opine that ONJ is not "rare." Prof. Ray admits that "rare" is subjective, based on his own personal opinion, and undefined in the scientific literature. (2/27/10 Ray Dep. at 168.) Allowing Prof. Ray to opine that ONJ is not a rare occurrence after being proffered as an expert is very likely to lead the jury to infer that it is based on a scientific representation. Therefore, the Court grants Novartis' motion to exclude Prof. Ray's statement that ONJ is "not a rare condition" as unreliable under *Daubert* and prejudicial pursuant to Rule 403.

### g. Prof. Ray's Opinion on the Biological Plausibility that IV BP drugs Cause ONJ

Novartis seeks to exclude any opinions by Prof. Ray as to whether it is biologically plausible that IV BP drugs increase the risk of ONJ because he is not a qualified medical expert. However, Novartis' objections take Prof. Ray's opinion out of the context for which it is being offered. Prof. Ray is not presenting his own independent opinion as a medical expert but is offering his opinion in the context of his assessment of the Bradford Hill factors based on a hypothesis that is strongly supported in the relevant medical literature. Prof. Ray's opinions are expressed as part of his epidemiologic analysis of causation, which, as previously discussed, Prof. Ray is sufficiently qualified to perform. Thus, the Court denies Novartis' motion to exclude Prof. Ray's opinions on the biological plau-

sibility of IV BP drugs causing ONJ. *See Pfizer*, 2010 WL 1047618, at *6 (permitting testimony about a plausible hypothesis about a causation mechanism where the "hypothesis has been deemed plausible and credible in the relevant medical literature, and is well within [the expert's] field of expertise based on his training, experience, and history of publication").

**h. Prof. Ray's Opinions on the AZURE Trial and Post–Marketing Data that Were not Included in his Expert Report**

At one of Prof. Ray's many depositions that took place after the submission of his expert report, Novartis elicited his opinions with regard to the AZURE clinical trial and post-marketing data. Although the Court agrees that Novartis cannot claim surprise by any of Prof. Ray's opinions that it elicited and questioned him on at length, this does not necessarily render them admissible. The Court has no basis upon which to find that Prof. Ray's opinions on the AZURE trial and post-marketing data are scientifically unreliable or that he lacks sufficient qualifications to opine on them. Thus, the Court denies Novartis' motion to exclude the testimony at this juncture based upon the "element of surprise," but will not prevent Novartis from raising at trial objections on other relevant grounds.

**F. Novartis' Motion to Exclude the Opinions of Dr. Fletcher**

 Dr. Robert Fletcher is a Professor Emeritus of Ambulatory Care and Prevention at Harvard Medical School and Harvard Pilgrim Health Care and an adjunct professor in the Department of Epidemiology and Social Medicine at the University of North Carolina at Chapel Hill. In addition, Dr. Fletcher is an experienced author, peer reviewer and editor for scientific journals, having previously served as a Co-

editor of the Annals of Internal Medicine from 1990–1993 and currently serving as the Chair of the Publications Policy Committee of the World Association of Medical Editors.

At trial, the Plaintiffs seek to have Dr. Fletcher provide expert testimony concerning the adjudication of the results of the Health Outcomes and Reduced Incidence With Zoledronic Acid One Yearly Fracture Trial ("HORIZON–PFT"), and the accuracy of an article publishing the results. The HORIZON–PFT was a clinical trial that began in 2002, and involved giving 7800 women with postmenopausal osteoporosis annual infusions of either zoledronic acid or a placebo in an effort to determine whether the drug reduced the incidence of osteoporotic fractures. In 2005 an Adjudication Committee was established to determine if any of the HORIZON–PFT participants developed ONJ. Based on a blind review of the results, the Adjudication Committee determined that one patient in the zoledronic acid group had ONJ and one patient in the placebo group had "possible" ONJ. The Adjudication Committee's results were compiled in a Special Expert Evaluation Report ("SpEER") by Dr. John Grbic and Dr. Regina Landesberg in January 3, 2007. Neither Dr. Grbic nor Dr. Landesberg were on the Adjudication Committee. Although the SpEER indicated in the text that one person in the placebo group had "possible" ONJ, in a section at the end the possible case was listed under the heading of confirmed cases.

The SpEER was not published. However, its' authors Dr. Grbic and Dr. Landesberg, along with others, published an article in 2008 in the Journal of the American Dental Association, which recounted the outcomes of the HORIZON–PFT trial and discussed potential cases of ONJ in the HORIZON–PFT (the "JADA article"). In

the JADA article, the authors omitted the qualifier "possible" and reported the incidence of ONJ in the placebo patient as a confirmed case. Based on the SpEER and the JADA article's reporting of the ONJ case in the placebo group, the Plaintiffs intend to have Dr. Fletcher testify that it was a violation of a basic tenet of medical journalism to change a "possible" case to a confirmed case; that this error gave the appearance that ONJ occurs in patients with osteoporosis who are not exposed to zoledronic acid; that this error gives the impression that ONJ occurs equally in both groups; and that the JADA article was likely to have had substantial influence of the medical/dental community. (Fletcher Report ¶¶ 20, 21.) Essentially, Dr. Fletcher would testify as to the falsity of the JADA article, and the impact of the JADA article's publication on prescribing doctors.

The Court does not doubt that Dr. Fletcher is extremely well educated, and, in some cases, the testimony of an expert on the conduct and reporting of clinical trials may be useful. However, the Court does not see how Dr. Fletcher's testimony is relevant, or required, in the case at hand. As an initial matter, the Court agrees with Novartis that the conduct of the clinical trial is not in dispute, but rather the reporting of the trial's results and the impact of that reporting. Here, the parties' arguments boil down to two questions: 1) Is Dr. Fletcher's testimony on the impact of the JADA article on medical/dental community relevant to the specific claims of the individual Plaintiffs and 2) Is Dr. Fletcher's testimony regarding the falsity of the JADA article necessary to rebut the Novartis experts. Because the Court finds that both of these questions are answered in the negative, the Court grants Novartis' motion to exclude Dr. Fletcher's testimony.

As to the claims of the individual Plaintiffs in this case, it is undisputed that both Mr. Napolitano and Mrs. Deutsch were prescribed the drugs before either article was written; developed their ONJ symptoms before either article was written; and ceased taking the drugs prior to when the articles were written. Mrs. Deutsch ceased taking Zometa and was diagnosed with possible ONJ in 2003, and Mr. Napolitano ceased taking Zometa and was tentatively diagnosed with ONJ in or around July 2005. It is also undisputed that the Adjudication Committee, whose results ultimately lead to the SpEER and JADA article, was not convened until June 2005. Regardless of whether the JADA article accurately reported the results of the HORIZON–PFT and regardless of the impression these inaccuracies would have on prescribing doctors and potential patients, the two subjects of Dr. Fletcher's testimony, these articles could not be said to have influenced the decisions of the Plaintiffs' doctors to prescribe the drugs for them. Indeed, Dr. Fletcher admits as much in his deposition where he testified that the information about the placebo patient in the HORIZON–PFT trial as reported in the SpEER and the JADA article could not have influenced the prescribing or diagnosis decisions for patients who stopped taking the drugs and received possible diagnoses of ONJ before the SpEER was written and the JADA article was published. (09/09/09 Fletcher Dep. at 62:11–65:9.) Although the Plaintiffs' contend that these articles reflect the results of a plan to cover up the risk that zoledronic acid causes ONJ that started in July 2003, they have not identified why such a plan would be relevant to their claims, or how Dr. Fletcher's qualifications to testify about the impact of an article published in 2008 would also qualify him to discuss how Novartis' actions prior to 2008 may have harmed the Plaintiffs. "Expert testimony

which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591, 113 S.Ct. 2786, 2795–96, 125 L.Ed.2d 469 (1993). Accordingly, the Court finds that Dr. Fletcher's proposed testimony is irrelevant to the Plaintiffs' underlying claims.

The Plaintiffs' further argue that twelve of Novartis' experts rely on the JADA article for the proposition that zoledronic acid does not cause ONJ, and therefore Dr. Fletcher's testimony is required to undermine this testimony by showing the falsity of a document the Novartis experts relied upon in reaching their conclusions. Specifically, the Plaintiffs' argue that a lay jury will be unlikely to have knowledge about the scientific publication process, and Dr. Fletcher's testimony will reveal that the Novartis experts relied on false information in rendering their opinions. The Court does not find this argument persuasive. To the extent Dr. Fletcher's testimony is based on comparing the representations in SpEER to how they were characterized in the JADA article, this observation does not require "scientific, technical, or other specialized knowledge" as required under Rule 702. A jury is certainly capable of comparing the two documents and observing the difference between one identifying a case of ONJ in the placebo group as possible and another stating that the same case is confirmed.

While there may be scientific grounds for proving the falsity of the SpEER or the JADA article "[i]t is the reporting of the HORIZON trial in JADA, relative to the best available results from the study itself, that [Dr. Fletcher has] criticized." (Fletcher Rebuttal Report ¶ 5.) The only vaguely scientific challenge that Dr. Fletcher makes is that the experts would improperly interpret the JADA article to state that exposed bone was present in the placebo patient based on the fact that the Adjudication Committee had defined ONJ to include exposed bone. Dr. Fletcher contends that the patient records do not support the finding that exposed bone was present, not based on his own interpretation of the data, but because, if they did, it would have been included in the SpEER. It is undisputed that Dr. Fletcher does not have expertise in dentistry, ONJ, or biphosphonates to qualify him to scientifically opine on whether the patients actually exhibited exposed bone. (Pls.' Br. at 20.) Furthermore, Dr. Fletcher admitted that no scientific expertise was required to reach his conclusion, stating at his deposition:

> Q. . . . .And you don't know one way or another if to people in the dental field that this could implicitly or inherently mean to that person that there was exposed bone?
>
> A. I didn't see anything in there that I—I would imagine a dental person would think there was exposed bone.
>
> Q. But you don't know because that's not your field correct?
>
> A. It's not about my field. Exposed bone and these data are something that even a layman could read.

(03/04/09 Fletcher Dep. at 153:5–16.)

Contrary to the Plaintiffs' contention, Dr. Fletcher's testimony is not admissible to show the "simple existence of the lie" under Rule 702 unless the observation will "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. As the Plaintiffs' own exhibits show, the JADA article was one of hundreds of documents that the Novartis experts relied upon in forming their opinions. To the extent the Novartis experts rely on the JADA article as accurate in reaching their conclusions, the Plaintiffs' can cross-examine them on the presence of

the alleged discrepancy and its impact on their findings.

Finally, the Plaintiffs' argue that Dr. Fletcher's testimony is needed to rebut the argument by one of Novartis' experts, Dr. Browner, that there may have been a valid reason for excluding the word possible in the JADA article. However, whether it was proper to omit the word possible is only relevant in two situations, neither of which requires Dr. Fletcher's testimony. Either the Novartis experts specifically relied on the JADA article to reach their conclusions, in which case they can be cross-examined with the underlying data, or the omission misled prescribing doctors, which the Court has found is irrelevant to the instant matter. Thus, the Court finds that Dr. Fletcher's testimony does not meet the requirements of Rule 702 and grants the Novartis *Daubert* motion to exclude Dr. Fletcher's testimony in its entirety.

### G. Novartis' Motion to Exclude the Opinions of Dr. Suzanne Parisian

█ Dr. Parisian is the founder of the regulatory and medical consulting firm MD Assist, Inc., which specializes in matters involving the regulation of products by the FDA. Dr. Parisian's educational background is in the medical field. She received a medical degree in 1983 from the University of South Florida, a Board Certification in Anatomic and Clinical Pathology in 1989, and a Masters in Biology from the University of Central Florida.

Although briefly a general practitioner, Dr. Parisian's work experience has primarily been with regulatory agencies. From 1991 to 1995 Dr. Parisian was a Commissioned Officer in the United States Public Health Service, where she was primarily assigned to the Center for Devices and Radiological Health ("CDRH") at the FDA. At the FDA, Dr. Parisian's worked as a Medical Officer in the Office of Health Affairs ("OHA") and in the Office of Device Evaluation ("ODE"). During her time at the OHA, Dr. Parisian primarily worked on regulatory and safety issues associated with drugs and devices already on the market. At the ODE, she focused on pre-marketing evaluations and safety issues associated with new product applications. Dr. Parisian was involved in 162 risk assessments at the OHA, and an additional 100 risk assessments while at the ODE. In addition, Dr. Parisian was an instructor at the FDA's Staff College, where she trained colleagues in the design and evaluation of clinical data in investigational and pre-marketing applications and trained medical officers on the process for health risk assessment and health evaluation pursuant to FDA regulations. Dr. Parisian was also sent by the FDA to provide guidance on the FDA's interpretation of Food and Drug laws as they pertain to medical products and the roles of manufacturers and health care providers. After leaving the FDA, Dr. Parisian has remained involved and up to date in the FDA regulatory process, including participating in a panel of experts convened by the FDA and authoring a book about the FDA.

In the instant litigation, Dr. Parisian has submitted a 120–page report, where she provides nine opinions within four sections addressing:

[1] the role, process and functions of FDA and the responsibilities of pharmaceutical drug sponsors; [2] Novartis' conduct regarding New Drug Application ("NDA") approvals and post-approval of its two intravenous bisphosphonates, Aredia and Zometa; [3] Novartis' pharmacovigilance efforts, investigation of osteonecrosis of the jaw ("ONJ") and interactions with FDA; and [4] Novartis' communication of ONJ risks to health care providers.

(Parisian Report ¶ 14.) Each section within the report provides a detailed summary of the evidence in the record and a discussion that purportedly provide the bases for her opinions. Novartis seeks to exclude Dr. Parisian's opinions in their entirety on the grounds that her lack of qualifications and unreliable methodology render her opinions inadmissible pursuant to Rule 702 and *Daubert.*

Dr. Parisian is seasoned-veteran of product liability litigation and both parties have cited a litany of cases where her testimony has been accepted, excluded, or limited in support of their respective positions. This Court is not bound by any of those cases, only by the criteria of *Daubert,* Rule 702, the Second Circuit, the Supreme Court, and to some extent the rulings of the MDL court. However, these cases do provide a helpful analysis of the underlying issues. Novartis argues that this Court should follow a recent decision by the Southern District of Florida in *In re Trasylol Products Liability Litigation,* 709 F.Supp.2d 1323 (S.D.Fla.2010), where the court excluded Dr. Parisian's expert report in its entirety, finding that she was unqualified to offer many of the opinions in her report, and that her method of regurgitating facts without any analysis constituted an unreliable methodology and usurped the role of the jury.

On the other hand, the Plaintiffs' point the Court to two decisions in the *Fosamax* litigation in the Southern District of New York, as well as other cases dealing with the association between bisphosphonates and ONJ, where the courts have admitted Dr. Parisian's expert report, albeit with various limitations. According to the Plaintiffs', it would be inconsistent for this Court to exclude Dr. Parisian's testimony because "Dr. Parisian has testified in every bisphosphonate ONJ case against a pharmaceutical company that has ever been tried, and has never been excluded from such a case." (Pl. Br. at 2.)

However, what is relevant to the motion before this Court is not what drug Dr. Parisian is testifying about, but the content of her report. And, having reviewed Dr. Parisian's report, the Court finds as follows: (1) Novartis' motion to exclude Dr. Parisian's testimony as to the FDA regulatory requirements and processes generally is denied; (2) Novartis' motion to exclude Dr. Parisian's opinions as to Novartis' compliance with FDA regulations, including her opinions on labeling and the monitoring and safety of the clinical trials is denied without prejudice because, as explained below, the Court finds that a *Daubert* hearing, which the Court is scheduling for April 11, 2010, is necessary to determine their admissibility; and (3) Novartis' motions to exclude Dr. Parisian's opinions on pharmaceutical industry standards, ghostwriting and undisclosed company funding of publications, causation and diagnosis are granted.

### 1. Dr. Parisian's Opinions on the FDA Regulatory Scheme and the Role of the FDA and Pharmaceutical Companies Generally

The Court finds that Dr. Parisian is qualified to testify with regard to the FDA in general and the regulatory requirements relating to the development, testing, marketing, and post-market surveillance of prescription drugs. While at the OHA, Dr. Parisian was intimately involved in regulatory and safety issues associated with drugs and devices already on the market and, during her time as a Medical Officer at the ODE, Dr. Parisian focused on pre-marketing evaluations and safety issues associated with new product applications. The fact that the most of this experience related to medical devices does not undermine her considerable knowledge

and expertise with respect to the various obligations of pharmaceutical companies and the FDA under the relevant regulations.

Although Dr. Parisian was only at the FDA for a short time, the fact that she was involved in instructing other trainers on matters relevant to her expertise, and that the FDA and others in the industry have continued to rely on her for guidance on FDA regulations, highlights the significance of her experience. Finally, throughout the first section of her report, Dr. Parisian demonstrated a specialized knowledge of the relevant regulations; how these regulations are interpreted and implemented by the FDA; and the collaborative process between manufacturers and the FDA in ensuring compliance with these regulations. *See In re Fosamax Prods. Liab. Litig.*, 645 F.Supp.2d 164, 191 (S.D.N.Y.2009) (admitting Dr. Parisian's testimony about "general FDA regulatory requirements and procedures" because "[a] lay jury cannot be expected to understand the complex regulatory framework that informs the standard of care in the pharmaceutical industry"); *Reece v. Astrazeneca Pharm., LP,* 500 F.Supp.2d 736, 744 (S.D.Ohio 2007) (admitting Dr. Parisian's expert testimony on "the regulations governing the approval, labeling, advertising and marketing of pharmaceutical and medical products; the processes by which the FDA determines the efficacy and safety of new drugs and new drug applications; the issues the FDA considers in the development of product labeling and marketing information; and a manufacturer's responsibility within this system"); *Lillebo v. Zimmer, Inc.*, No. 03–CV–2919, 2005 WL 388598, at *5 (D.Minn. Feb. 16, 2005) (admitting Dr. Parisian's testimony on, among other things, "the general nature of the approval and regulatory process [and] the FDA's general expectations with respect to testing and marketing of new prod-

ucts"); *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, No. 05–MDL–1708, 2007 WL 1964337, at *8 (D.Minn. June 29, 2007) (admitting similar testimony from Dr. Parisian).

## 2. Dr. Parisian's Opinions on the Compliance by Novartis with FDA Regulations and Interactions with the FDA

Novartis challenges both Dr. Parisian's qualifications to opine on the reasonableness of Novartis' conduct in complying with FDA regulations and interacting with the FDA, and the reliability of Dr. Parisian's methodology in forming her opinions. With regard to Dr. Parisian's qualifications, the Court finds that it is within Dr. Parisian's expertise and experience to opine on the reasonableness of Novartis' conduct in its interactions with the FDA and compliance with FDA regulations, including Novartis' interactions with the FDA with respect to the labels and warnings, and FDA regulations and interactions with companies regarding clinical trials. While the Plaintiffs' experts such as Drs. Vogel and Skubitz can opine on the adequacy of the warnings from the perspective of a prescribing physician, as Novartis' objections to their testimony demonstrates, the adequacy of the warnings in light of the relevant FDA regulations is also relevant to the ultimate issue. *See Stevens v. Novartis Pharmaceuticals Corporation,* No. DV–08–100, Docket # 396 (Mont. Oct. 14, 2009) (Pls.' Br., Ex. 1 at 3) (admitting Dr. Parisian's testimony in a state court Aredia/Zometa proceeding on Novartis' compliance with FDA regulations on labeling because "[t]he issue of adequacy of warning and labeling must be viewed, in part, in the context of the FDA's role in the approval and marketing of pharmaceuticals"). Accordingly, the Court finds that Dr. Parisian's specialized

knowledge in the interplay between the FDA and pharmaceutical companies in obtaining drug approval, developing and approving labels and warnings, and in conducting and monitoring clinical trials would be helpful to the trier of fact in providing a opinion on the actions by Novartis from a regulatory perspective.

However, the inadequacy of Dr. Parisian's methodology as reflected in her report makes the Court hesitant to admit Dr. Parisian's testimony with regard to Novartis' compliance with regulations and interactions with the FDA without a *Daubert* hearing to assess its reliability. The format of Dr. Parisian's report is such that she describes her personal experience and all of the relevant FDA regulations and procedures upfront, but fails to directly tie it to her analysis. To determine whether Dr. Parisian's opinions were anything other than *ipse dixit*, the Court had to continually refer back to the opening sections of her report to determine what regulation Dr. Parisian was referencing or if her personal experience could serve as the basis for a particular opinion. For example, Dr. Parisian makes statements such as "Novartis also failed its regulatory duties to provide full and fair information to the healthcare community" and then only provides a narrative of what information was allegedly known and not disclosed. (Parisian Report ¶ 95.)

The Court finds it problematic that Dr. Parisian does not go through and connect each alleged deficiency to a requirement in a particular regulation, even though one can be inferred from the statute, or to the extent an opinion is not based on a statute, how it derives from her personal experience. The purpose of an expert is to assist the trier of fact based on the expert's specialized knowledge. If the Court or the jury were able to recreate Dr. Parisian's opinion solely by comparing the documents to the regulations, there would be no admissible basis for her testimony. Novartis contends that is exactly the case here and that Dr. Parisian does not provide any expertise in reaching her conclusions that a lay jury could not determine simply by comparing the evidence to the relevant regulations. However, having reviewed the contents of the report, the Court finds that an opinion on the actions of Novartis from the perspective of an expert in FDA operations and regulations would be helpful to the jury. The question is whether Dr. Parisian can reliably provide that analysis.

Other courts have excluded Dr. Parisian's testimony based on the disconnect between her analysis and opinions. *See, e.g., Trasylol*, 709 F.Supp.2d at 1347 ("All of Dr. Parisian's opinions suffer from this fatal flaw: she recounts Trasylol's regulatory history, the contents of Bayer's internal documents and e-mails, and the findings of scientific studies; she then offers a broad opinion, often outside her scope of expertise, that is not connected to the underlying facts in any apparent way and that lacks regulatory expert analysis."); *Lopez v. I–Flow Inc.*, No. 08–CV–1063, Docket # 300, at 18–20, 2011 WL 1897548, at *10 (D.Ariz. Jan. 26, 2011) ("Dr. Parisian's report is a labyrinth that the Court cannot navigate.... In other sections, Dr. Parisian's report simply presents a narrative of selected regulatory and corporate events and quotations and then leaps to a conclusion without sufficient explanation.... As a result, none of Dr. Parisian's anticipated testimony is either helpful or reliable under Rule 702.... Because the proffered report does not allow the Court to glean any admissible opinions ... [t]he Court therefore excludes Dr. Parisian's anticipated testimony in its entirety."). Dr. Parisian's expertise will only be of assistance to the jury if she provides the foundational basis for each opinion as she ex-

presses it. To the extent she is unable to do so, such testimony is inadmissible. *See In re Prempro Prods. Liab. Litig.*, 554 F.Supp.2d 871, 879–87 (E.D.Ark.2008) (finding that the court should have struck much of Dr. Parisian's testimony as to punitive damages because it consisted of a regurgitation of the evidence devoid of expert analysis or opinion and unconnected to FDA regulations).

Further compounding the difficulty with Dr. Parisian's report is that in the context of stating her opinions, Dr. Parisian provides a factual narrative of events that is problematic in two ways. First, Dr. Parisian extensively quotes and cites evidence in the record that is not necessarily relevant to her proffered opinions. The court in *Fosamax* opted not to exclude Dr. Parisian's testimony on this ground but simply to limit it, *Fosamax*, 645 F.Supp.2d at 192 ("Dr. Parisian's commentary on any documents and exhibits in evidence will be limited to explaining the regulatory context in which they were created, defining any complex or specialized terminology, or drawing inferences that would not be apparent without the benefit of experience or specialized knowledge. She will not be permitted to merely read, selectively quote from, or 'regurgitate' the evidence."). However, the court in *Prempro* had to overturn a punitive damages award in part because Dr. Parisian "did not explain the documents, provide summaries, or tie them in to her proposed regulatory testimony" and "did not provide analysis, opinion, or expertise." *Prempro*, 554 F.Supp.2d at 880, 886.

In addition, the Court also notes that Dr. Parisian scatters improper personal opinions, speculation, and state of mind inferences throughout the narratives in her report. Such opinions are inadmissible insofar as "the opinions of [expert] witnesses on the intent, motives, or states of mind of corporations, regulatory agencies and others have no basis in any relevant body of knowledge or expertise." *In re Rezulin Prods. Liab. Litig.*, 309 F.Supp.2d 531, 546 (S.D.N.Y.2004). In addition, "bad company" opinions that are not based on any FDA regulation or other applicable standard are similarly inadmissible. *See Trasylol*, 709 F.Supp.2d at 1337–38. The Court finds that the Plaintiffs' assertion that Dr. Parisian does not offer such opinions to be disingenuous. Below are just a few examples of Dr. Parisian's "opinions" that make improper judgments as to motivations of Novartis:

- Accusing Novartis of holding a meeting "[u]nder the guise of science" where "[e]ach key Novartis person was called on to present facts to the panel members that were not true in light of what Novartis knew." (Parisian Report ¶ 95.)
- "While Novartis delays, it profits from Zometa's continuing sales . . . . Novartis' delay unfortunately also directly contributes to unnecessary ONJ injuries for patients." (*Id.*, ¶ 195.)
- " . . . . Novartis undertook to manipulate the data and downplay the findings of the study in terms of the risks of ONJ and the use of Zometa." (*Id.*, ¶ 213.)
- "Novartis' goal was to prevent escalation of ONJ concerns in the professional community . . . ." (*Id.*, ¶ 235.)

These opinions, and others like them, which implicitly opine on bad faith, intent, motive, or state of mind are inadmissible.

Rather than exclude Dr. Parisian's opinions on Novartis' reasonableness in complying with FDA regulations, a subject that this Court deems highly relevant to the instant litigation, the Court denies the motion by Novartis without prejudice. The Court will revisit these issues following a *Daubert* hearing on April 11, 2010 to

determine whether: (1) Dr. Parisian employed a reliable methodology and (2) Dr. Parisian can testify as to her opinions within the confines of certain limitations so as to avoid prejudice to Novartis. When permitting expert testimony on an ultimate issue of fact, "courts must be guided by the language of Rules 702 and 403 and permit only expert testimony that assists the trier of fact and is not more prejudicial than probative." *Perkins v. S. New England Tel. Co.*, No. 07–CV–967, 2011 WL 336715, at *3 (D.Conn. Jan. 31, 2011) (citing *Nimely v. City of New York*, 414 F.3d 381, 398 (2d Cir.2005)).

### 3. Dr. Parisian's Opinions on Pharmaceutical Industry Standards, Ghostwriting and Undisclosed Company Funding of Publications, Causation and Diagnosis

Although Dr. Parisian may be qualified to opine on the actions of a pharmaceutical company as it relates to its interactions with the FDA, Dr. Parisian is not qualified to opine on the ethical standards in the pharmaceutical industry, nor is she qualified to testify as to any obligations Novartis may have had to the medical community in addition to the FDA requirements. The Plaintiffs' argue that it is "perfectly within the scope of Dr. Parisian's expertise to proffer what a reasonable manufacturer would do or industry standards" because Dr. Parisian's opinions "are grounded in the FDA regulations and those standards that govern NPC's Aredia and Zometa." (Pl. Br. at 24.) However, the portion of Dr. Parisian's report discussing pharmaceutical industry standards does not refer to any FDA regulations, but rather to various organizations that govern "national and international industry standards for production, marketing and labeling of pharmaceuticals." (Parisian Report ¶ 66.) Dr. Parisian has never worked at a pharmaceutical company or with a pharmaceutical company outside of her interactions with companies involved in FDA processes. Accordingly, the Court grants Novartis' motion to exclude Dr. Parisian's opinions on ethical standards in the pharmaceutical industry or the obligations of Novartis in addition to those required by the FDA.

Furthermore, the Court grants Novartis' motion to exclude Dr. Parisian's opinions on the use of ghostwriters by Novartis and the undisclosed company funding of publications. The Plaintiffs' argues that this testimony is relevant because it goes to Novartis' "communication of ONJ risks to health care providers and the public," which are required to be "fair and balanced" under 21 C.F.R. § 202.1. (Pl. Br. at 21.) While this testimony may be relevant, Dr. Parisian does not provided any foundation beyond her personal opinion that the use of ghostwriters or the undisclosed funding of publications does not provide "fair and balanced" information.

Finally, while the Plaintiffs' assert that Dr. Parisian will not opine on causation or make independent ONJ diagnoses, these assertions are contradicted by her report. In "Opinion # 9" Dr. Parisian states:

> In its communications to the medical community, Novartis continues to challenge the strength of the association and a finding of causation on the basis of a lack of scientific research on the topic. In fact, causation is clear and to the extent further elucidation is required, Novartis has failed in its responsibilities by delaying performance of a complete safety evaluation.

(Parisian Report at 114.) Dr. Parisian does not purport to be an expert on causation, nor has she been designated as such an expert. The Court also notes that Dr. Parisian does not provide any support for her contention that Novartis is to blame

for the lack of definitive evidence on causation. Indeed, Dr. Parisian's statement is inconsistent with the testimony of one of Plaintiff Deutsch's non-retained experts, Dr. Salvatore Ruggiero, who also happens to be one of the leading researchers in this field. Dr. Ruggiero testified at his deposition that the reason causation has not been proven to a scientific certainty is because of the difficulty in getting the kind of definitive data that would be needed through a randomized double blind controlled study. Dr. Ruggiero did not place the blame on Novartis, but rather stated that the difficulty was due to the fact that the IV BP drugs are considered a standard form of care for many patients with breast cancer or multiple myeloma. (Ruggiero Dep. 77–78.)

In addition, the Plaintiffs' admit that Dr. Parisian is not qualified to diagnose ONJ, and contend that she does not purport to offer any opinions based on her own diagnosis of ONJ. This too is inconsistent with Dr. Parisian's report. For example, when opining that Novartis disregarded and misrepresented reports of ONJ prior to December 2002, Dr. Parisian cites an ONJ MedWatch report from August 22, 2002. Her determination that it was improper for Novartis to "disregard" the report is based on her own conclusion that it references a potential case of ONJ associated with Aredia. Dr. Parisian is not qualified to diagnose ONJ and cannot opine on the propriety of Novartis' actions based on her own diagnosis. Accordingly, the Court grants Novartis' motion to exclude any testimony by Dr. Parisian that involves her own assessment of diagnosis or causation.

### H. Novartis' Motions to Exclude the Plaintiffs' Non–Retained Experts

█ Novartis filed two separate motions, which the Court combines for purposes of analysis, to exclude causation testimony by the treating physicians of Mrs. Deutsch and Mr. Napolitano, who have been designated as non-retained experts under Federal Rule of Civil Procedure 26(a)(2)(A) ("Rule 26(a)(2)(A)").

On January 26, 2009, the parties entered in to an Agreed Order Regarding Disclosures of Non–Retained Expert Witnesses in Wave I–A Cases ("Agreed Order") pursuant to Rule 26(a)(2)(A). (Deutsch case Docket # 42.) The Agreed Order required the parties to disclose a person as a non-retained witness (the "Witness") if the party intended to use the non-retained witness to present evidence at trial in one of the following circumstances:

(a) the Witness is a health care provider (including any dental health care provider) who treated or evaluated the plaintiff or decedent at issue in that lawsuit and from whom the party may elicit an opinion regarding the cause of a jaw problem allegedly experienced by the plaintiff or decedent; (b) the Witness is a health care provider, including any dental health care provider, who treated or evaluated the plaintiff or decedent at issue in that lawsuit and from whom the party may elicit an opinion that the Witness developed or formed outside the scope of the Witness's treatment or evaluation of the plaintiff or decedent; or (c) the Witness has not been deposed in that lawsuit and the party may use the Witness at trial of that lawsuit to present evidence within the scope of Federal Rule of Evidence 702, 703, or 705.

(Agreed Order at 1–2.) Pursuant to the Agreed Order, Plaintiff Deutsch designated the following five medical and dental care providers who treated his late wife Helene Deutsch to testify as follows:

(1) Dr. Salvatore L. Ruggiero, DMD— "Dr. Ruggiero is Mrs. Deutsch's treating Oral and Maxillofacial surgeon. He is expected to testify that Mrs. Deutsch

sustained devastating facial impairment as a result of bisphosphonate treatment."

(2) Dr. Bruce Kappel—"Dr. Kappel is Mrs. Deutsch's primary treating oncologist. He is expected to testify that Mrs. Deutsch was diagnosed with metastatic breast cancer. He provided her with various therapies. He witnessed her suffering and the complications of the osteonecrosis of the jaw from her use of the bisphosphonates."

(3) Dr. Ronald Molinari, DDS—"Dr. Molinari is Mrs. Deutsch's general dentist. He is expected to testify that Mrs. Deutsch came in for regular dental check-ups, dental imaging, periodontal cleaning and other treatments."

(4) Dr. Richard Berg, DDS—"Dr. Berg is Mrs. Deutsch's treating oral surgeon. He is expected to testify that Mrs. Deutsch was treated for several extractions of teeth, was sent for dental imaging. Dr. Berg is aware of the complications with osteonecrosis of the jaw and the many infections it caused her to suffer."

(5) Dr. Ezra Bendit—"Dr. Bendit is Mrs. Deutsch's treating primary care physician. He is expected to testify that he treated Mrs. Deutsch for breast cancer. He is aware of the complications she has suffered from the osteonecrosis of the jaw and the pain she suffered."

(Plaintiff Deutsch's Rule 26(a)(2)(A) Statement.) Subsequently, the parties entered into a stipulation specifically excluding Dr. Bendit from offering causation testimony.

Furthermore, also pursuant to the Agreed Order, Plaintiff Forman designated the following medical and dental care providers who treated her late husband John Napolitano:

(1) Dr. Stephen Gelfman—"Dr. Gelfman was Mr. Napolitano's treating oral surgeon. He is expected to testify that he performed a few extractions on Mr. Napolitano related to Mr. Napolitano's osteonecrosis. He advised Mr. Napolitano to notify his oncologist that the osteonecrosis of the jaw was [a] complication which he believe was from the bisphosphonates treatment."

(2) Dr. Elliot Kessler, DDS—"Dr. Kessler was Mr. Napolitano's treating general dentist. He is expected to testify that Mr. Napolitano was given comprehensive dental care which was routine dental care. He examined Mr. Napolitano and noticed that he had exposed bone and diagnosed it as a bone spicule. He later became aware that Mr. Napolitano was diagnosed with osteonecrosis of the jaw on the right side and that it was caused by bisphosphonates treatments he was receiving."

(3) Dr. Abraham Chachoua—"Dr. Chachoua was Mr. Napolitano's treating oncologist. He is expected to testify that Mr. Napolitano was diagnosed with prostate cancer and he administered Zometa to Mr. Napolitano. After several examinations he noted that Mr. Napolitano had a lower jaw bone spur. Mr. Napolitano was then diagnosed with osteonecrosis of the jaw after he was referred to an oral surgeon."

(Plaintiff Forman's Rule 26(a)(2)(A) statement.)

Based on the descriptions of the expected testimony, Novartis asserts that only Dr. Ruggiero and Dr. Gelfman were designated to specifically offer opinions as to causation. However, according to Novartis, in subsequent correspondence, the Plaintiffs' counsel suggested that they might also seek causation testimony from Dr. Kappel and Dr. Kessler. As a result, Novartis filed these voluminous motions in an "abundance of caution" to ensure that any potential causation opinions by Drs. Ruggiero, Gelfman, Kappel, Molinari,

Berg, Kessler, or Chachoua be excluded. For their part, the Plaintiffs' do not deny that these experts may indirectly offer opinions on causation, and argue both that the MDL court has already admitted the non-retained experts opinions on causation, and that they are nevertheless qualified to offer such opinions.

### 1. The MDL Decision

Novartis raised the same objections to the MDL court in conjunction with the motion for summary judgment. The MDL court mooted these motions in light of the specific causation testimony of the Plaintiffs' retained experts, but held that all of Mrs. Deutsch and Mr. Napolitano's non-retained experts were permitted to testify "as to the facts of [their] symptoms, tests, diagnosis and treatment, as to what they did in response to [his or her] condition and as to what they would have done differently, if anything, had they known of any additional warnings." *In re Aredia and Zometa Prods. Liab. Litig. ("Aredia Forman")*, No. 06–MD–1760, 2009 WL 2496859, at *3 (M.D.Tenn. Aug. 13, 2009); *In re Aredia and Zometa Prods. Liab. Litig. ("Aredia Deutsch")*, No. 06–MD–1760, 2009 WL 2496886, at *3 (M.D.Tenn. Aug. 13, 2009). The Plaintiffs' contend that the MDL court implicitly ruled on the instant motions because "diagnosis" is "tantamount to a statement of cause." (*See, e.g.*, Pl. Deutsch's Br. at 1.) This argument is belied by the fact that, if the MDL orders were intended to be read in such a manner, the MDL court would have denied as opposed to having mooted the motions with respect to specific causation. Furthermore, the MDL court specifically stated in its rulings on similar motions to exclude specific causation testimony by non-retained experts that "the ability to diagnose medical conditions is not the same as the ability to opine as an expert about the *causes* of those medical condi-

tions." *In re Aredia and Zometa Prods. Liab. Litig. ("Aredia Simmons")*, 754 F.Supp.2d 934, 938, 2010 WL 4970910, at *3 (M.D.Tenn. Dec. 7, 2010). Accordingly, the Court finds that the MDL order does not extend so broadly as to permit specific causation testimony by any of the non-retained experts.

### 2. Legal Standard for the Admissibility of Causation Opinions by Non–Retained Experts

Novartis contends that, to the extent the non-retained experts seek to opine on causation, either directly or indirectly, such testimony should be precluded under *Daubert* and Rule 702. According to Novartis, all of the non-retained experts with the exception of Dr. Ruggiero are not qualified because they are not experts in ONJ or bisphosphonates, and all of the non-retained experts employed unreliable methodologies in reaching these opinions. The Plaintiffs' argue that the bar for admitting treating physician testimony is lower, and that to the extent other experts have been admitted to opine on causation who lacked expertise in ONJ or bisphosphonates, these experts ought to be permitted to do so as well.

As an initial matter, the Court recognizes that there is a fine line between testimony regarding diagnosis and course of treatment that may raise an inference of causation, and testimony directly addressing causation. There are many potential ways the Plaintiffs' may seek to elicit causation opinions through, as Novartis states it, the "backdoor." The Court cannot anticipate every potential opinion or line of testimony of these experts and make a binding determination on its admissibility under Rules 402, 403, 702, and 703. Accordingly, this decision solely addresses whether the treating physicians may directly offer opinions on specific causa-

tion—*i.e.*, whether Mrs. Deutsch and Mr. Napolitano had bisphosphonate induced ONJ caused by the use of Zometa or Aredia. To the extent that Novartis believes certain lines of questioning lead to an impermissible inference of causation, those objections may be raised at the trial.

"It is well settled that a treating physician is not subject to the disclosure obligations set forth in Fed.R.Civ.P. 26(a)(2)(B)." *Zanowic v. Ashcroft*, No. 97–CV–5292, 2002 WL 373229, at *2 (S.D.N.Y. Mar. 8, 2002). "Generally, a treating physician may provide expert testimony regarding a patient's illness, the appropriate diagnosis for that illness, and the *cause* of the illness." *Gass v. Marriott Hotel Servs., Inc.*, 558 F.3d 419, 426 (6th Cir. 2009) (emphasis added); *Monroe v. Zimmer U.S. Inc.*, No. 08–CV–2944, 766 F.Supp.2d 1012, 1031, 2011 WL 534037, at *17 (E.D.Cal. Feb. 14, 2011) (holding that because the plaintiff's treating physician was familiar with the plaintiff's medical history, he was "qualified to render opinion testimony on causation, diagnosis, or other matters based on his treatment of plaintiff").

However, when the treating physician seeks to opine on causation, that opinion "is subject to the same standards of scientific reliability that govern the expert opinions of physicians hired solely for the purposes of litigation." *Aredia Simmons*, 754 F.Supp.2d at 936, 2010 WL 4970910, at *1; *Barrett v. Rhodia, Inc.*, 606 F.3d 975, 982 (8th Cir.2010) ("[The treating physician's] opinion on causation is subject to the same standards of scientific reliability that govern the expert opinions of physicians hired solely for the purpose of litigation.") (internal quotation marks and citation omitted); *Campbell v. CSX Transp., Inc.*, No. 08–CV–2045, 2009 WL 1444656 at *3 (C.D.Ill. May 21, 2009) ("[W]e do not distinguish the treating physician from other experts when the treating physician is offering expert testimony regarding causation.").

In addition, treating physicians who are designated as non-retained experts under Rule 26(a)(2)(A) are "not ... permitted to render opinions outside the course of treatment and beyond the reasonable reading of the medical records." *Lamere v. New York State Office For The Aging*, 223 F.R.D. 85, 89 (N.D.N.Y.2004); *Aredia Forman*, 2009 WL 2496859, at *2 ("A treating physician for whom no expert report is supplied is not permitted to go beyond the information acquired or the opinion reached as a result of the treating relationship to opine as to the causation of an injury or give an opinion regarding the view of an expert called by the defendant.") (citing *Lorenzi v. Pfizer, Inc.*, 519 F.Supp.2d 742 (N.D.Ohio 2007)); *Brundidge v. City of Buffalo*, 79 F.Supp.2d 219, 225 (W.D.N.Y.1999) (permitting the plaintiff's treating physician to testify about "her opinion as to what caused plaintiff's mental problems as long as her opinion is based solely on her treatment of the plaintiff"). However, "most, if not all, courts that have considered this issue recognize that a treating physician often forms opinions and makes determinations during the various stages of the course of treatment." *Lamere*, 223 F.R.D. at 89–90 (citing *Santoro v. Signature Const., Inc.*, No. 00–CV–4595, 2002 WL 31059292, at *4 (N.D.N.Y. Sept. 16, 2002)).

The Plaintiffs' contend that this Court should follow the reasoning of the New York Supreme Court in *Streimer v. Biondo*, 21 Misc.3d 1124(A), 873 N.Y.S.2d 515 (Table), 2008 WL 4764807 (N.Y.Sup.Ct. Oct. 21, 2008), where the court admitted expert testimony, including that of Dr. Ruggiero, that the link between bisphosphonate therapy and osteonecrosis of the jaw was generally accepted in the medical

community in what appears to be the 2004–2005 time frame. However, this testimony was admitted for the purposes of determining whether the plaintiff's treating physicians' committed medical malpractice in failing to advise the plaintiff of the risks of ONJ as a complication of IV BP, not for specific causation. *Id.* at *6 ("Based upon the conflicting expert affidavits submitted by the parties, it appears that issues of fact and credibility exist in connection with whether the treatment provided by Dr. Biondo deviated from good and accepted dental practice, and whether plaintiff was given sufficient information relating to the risks associated with such treatment to provide informed consent."). Simply because the association between bisphosphonates and ONJ may have been generally accepted in the scientific community does not obviate the need for using a reliable methodology to determine whether a particular patient has BRONJ.

### 3. Motions to Exclude the Specific Causation Testimony of Dr. Kappel, Dr. Berg, Dr. Molinari, Dr. Kessler, and Dr. Chachoua

Drs. Kappel, Molinari, Kessler, and Chachoua have all testified that they are not experts in ONJ or its potential causes. (Kappel Dep. at 37–38, 153; Molinari Dep. at 140–41; Kessler Dep. at 144–45, 150–51; Chachoua Dep. at 20–21.) In addition, Drs. Kappel, Molinari, and Berg all testified that they have not developed an opinion to a reasonable degree of medical certainty as to whether Mrs. Deutsch had ONJ, and if so, whether it was caused by Aredia or Zometa. (Kappel Dep. at 151, 156; Molinari Dep. at 122, 124; Berg Dep. at 15.) Consistent with the decisions of the MDL court with regard to other non-retained experts, on these grounds alone the Court could exclude these experts' opinions on specific causation. *See In re*

*Aredia and Zometa Prods. Liab. Litig.* *("Aredia Anderson")*, 2009 WL 2496927, at *3 (M.D.Tenn. Aug. 13, 2009) (granting motion to exclude non-retained treating physicians who testified that they had no expertise in diagnosing ONJ, potential risk factors of ONJ, or Zometa's relationship with ONJ); *In re Aredia and Zometa Prods. Liab. Litig. ("Aredia Melau ")*, 2009 WL 2496921, at *3 (M.D.Tenn. Aug. 13, 2009) (granting motion to exclude non-retained treating physicians who testified, among other things, that they did not have an opinion to a medical certainty as to whether or not the plaintiff had ONJ). However, even if the Court were to find these experts qualified to opine on specific causation, the Court finds that their testimony would still be inadmissible under *Daubert* because it is not based on scientifically reliable or admissible methodologies.

Dr. Kessler testified that he did not make a diagnosis as to Mr. Napolitano or perform an independent differential diagnosis. (Kessler Dep. at 131.) Although Dr. Kessler has formed the opinion that Mr. Napolitano's ONJ was associated with bisphosphonates, this opinion is based on publications he reviewed after he stopped treating Mr. Napolitano. Therefore Dr. Kessler's opinion would only be admissible if he had been designated as an expert under Rule 26(a)(2)(B). *See Aredia Forman*, 2009 WL 2496859, at *2 ("A treating physician for whom no expert report is supplied is not permitted to go beyond the information acquired or the opinion reached as a result of the treating relationship to opine as to the causation of an injury or give an opinion regarding the view of an expert called by the defendant.").

Similar to Dr. Kessler, Dr. Molinari also testified that he never did his own independent evaluation to determine whether

Mrs. Deutsch had ONJ. (Molinari Dep. at 122:3–8.) In addition Dr. Molinari testified that he did not know what other treatments beyond dental extractions were potential risk factors for ONJ. (Molinari Dep. 148–151.)

Finally, although Dr. Berg may have been the first doctor to tell Mrs. Deutsch that her condition was likely BRONJ (Berg Dep. at 69–71), he testified that his diagnosis was not based on his own analysis, and that he was not qualified to make such a diagnosis:

Q. So was it your opinion that Mrs. Deutsch had what I guess now the literature is calling BONJ?

A. BONJ. No. No. There was no way for me to know that for sure, but what I knew for sure was she had an entity that was not responding to typical care; she was taking the drug; she was having a problem that was beyond the scope of what I felt I could help her with; and that guy who I had ultimate confidence in was also the guy who was seeing 63 of these patients with the same problem. And my feeling was that if anybody could evaluate it and determine whether she should be included in his protocol for the way he was managing these patients, he would make that decision.

(Berg Dep. at 156:14–157:7.) Here, Dr. Berg has explicitly stated that at the time of Mrs. Deutsch's diagnosis and treatment, he did not have the expertise to opine as to whether her ONJ was caused by Zometa and did not perform his own independent analysis. Insofar as Dr. Kessler, Dr. Molinari, and Dr. Berg did not perform their own independent assessments of whether Mrs. Deutsch or Mr. Napolitano had BRONJ, nor did they employ any other scientifically reliable methodology under *Daubert* for reaching such a conclusion, the motions by Novartis to exclude their specific causation testimony is granted.

With regard to Dr. Kappel and Dr. Chachoua, although both doctors performed their own differential diagnosis, the Court finds that neither had a scientifically reliable basis to support their conclusion.

■■■ "A differential diagnosis is a patient-specific process of elimination that medical practitioners use to identify the most likely cause of a set of signs and symptoms from a list of possible causes." *Ruggiero v. Warner–Lambert Co.*, 424 F.3d 249, 254 (2d Cir.2005) (internal quotation marks and citations omitted). "A medical expert's opinion based upon differential diagnosis normally should not be excluded because the expert has failed to rule out every possible alternative cause of a plaintiff's illness." *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 202 (4th Cir. 2001). However, even though "an expert need not rule out every potential cause in order to satisfy *Daubert*, the expert's testimony must at least address obvious alternative causes and provide a reasonable explanation for dismissing specific alternate factors identified by the defendant." *Israel v. Spring Indus., Inc.*, 98–CV–5106, 2006 WL 3196956, at *5 (E.D.N.Y. Nov. 3, 2006).

Dr. Kappel performed a limited differential diagnosis on Mrs. Deutsch to rule out radiation, metastasis or Xeloda. However, Dr. Kappel testified that he did not do the type of differential diagnosis in which he ruled out all of the possible causes of ONJ listed on the Zometa label, not because he did not think it was necessary, but rather because he "sent her for a consult for the expert who may—may have done that." (Kappel Dep. at 160:15–24.) As to Dr. Chachoua, he ruled out metastatic disease and infection (Chachoua Dep. at 153–55), but testified that he was unfamiliar with any other potential risk factors of ONJ and therefore did not rule them out in his

differential diagnosis (Chachoua Dep. at 162–64, 168). As the Court explained in section II.C *supra,* the failure to control for certain risk factors does not necessarily render a study, or in this case a differential diagnosis, unreliable. However, where, as here, there is no indication that Dr. Kappel and Dr. Chachoua made informed decisions to exclude such factors based on any identifiable expertise or medical literature, such a differential diagnosis is scientifically unreliable under *Daubert.* Therefore, the Court grants the *Daubert* motions by Novartis to exclude Dr. Kappel's and Dr. Chachoua's opinions on specific causation.

However, there is nothing to prevent these treating physicians from testifying as to the facts about the presence of osteonecrosis of the jaw or the severity of the alleged alternative cause factors. In addition, these treating physicians can testify as to the facts regarding the treatment plans they administered. However, they cannot go as far as opining as to whether Aredia, Zometa, or other present factors were or were not the cause of Mrs. Deutsch and Mr. Napolitano's conditions, and whether their conditions were BRONJ. The Plaintiffs' have not established that any of these treating physicians had the expertise in ONJ or its causes at the time of treatment to perform a reliable differential diagnosis, or to form reliable opinions on whether Mrs. Deutsch or Mr. Napolitano had BRONJ. Finally, the Court notes that this decision is not inconsistent with those orders permitting other oncologists and dentists who are not necessarily experts in ONJ or bisphosphonates to testify as to causation. Unlike non-retained experts, those experts were not limited to patient records and information available at the time of diagnosis and treatment in forming their opinions, and were subject to the Rule 26(a)(2)(B) reporting requirement.

### 4. Dr. Salvatore Ruggiero

Dr. Ruggiero is indisputably qualified to testify as to the cause of Mrs. Deutsch's ONJ. Dr. Ruggiero was one of the first oral maxillofacial surgeons to identify BRONJ. He performed one of the first studies linking bisphosphonates to ONJ that involved analyzing 63 patients, of which Mrs. Deutsch was one, and published his study in a peer-reviewed publication in 2004. He served on the Novartis Advisory Board convened in 2003 to present the findings of his study, and on another panel in 2004 where he was one of several specialists who were charged with creating guidelines of how to diagnose, manage, and prevent ONJ. Dr. Ruggiero diagnosed Mrs. Deutsch with BRONJ in 2004 based on certain medical records, information received from her treating physicians, and a physical examination. Dr. Ruggiero continued to treat Mrs. Deutsch until shortly before her death. At his deposition, Dr. Ruggiero testified that he believed when he diagnosed Mrs. Deutsch in 2004 that her ONJ was caused by her use of Aredia and Zometa, and still holds that belief today. (Ruggiero Dep. at 33, 90.)

Novartis first seeks to exclude Dr. Ruggiero's testimony that Mrs. Deutsch had BRONJ because it conflicts with his deposition testimony and published articles where he states that causation has not been proven. Dr. Ruggiero testified that it was and still is his belief that Mrs. Deutsch's ONJ was caused by the IV BP drugs. (*Id.* at 33:12–16, 63:7–10.) The Court finds that Dr. Ruggiero is qualified to testify as to whether, in his opinion, Mrs. Deutsch had BRONJ. Novartis' objections are proper grounds for cross-examination, not for exclusion.

Next, Novartis objects to Dr. Ruggiero's methodology because: (1) as a non-re-

tained expert he is limited to testifying to opinions that were central to his diagnosis and treatment at the time, and he has admitted that the only information available when he initially diagnosed Mrs. Deutsch were unreliable case reports and anecdotal reports and (2) his differential diagnosis is unreliable because he did not fully ascertain all the Mrs. Deutsch's relevant medical information and did not explain how he was able to rule out other potential causes of Mrs. Deutsch's ONJ. With regard to the case reports, the Court notes that Dr. Ruggiero did not testify that case reports were unreliable, but rather that they only suggest a causal relationship and were the best evidence available at the time. (Ruggiero Dep. at 88:10–19.) Furthermore, Dr. Ruggiero did not only rely on case reports, but also on his own personal experience. At the time when Dr. Ruggiero examined Mrs. Deutsch, who had a non-healing socket, he had seen 60 to 70 patients with consistent symptoms who had undergone IV BP therapy. (Ruggiero Dep. at 15.) Even if case reports on their own are not reliable evidence of causation, they do contribute to the reliability of a causation determination. Dr. Ruggiero relied on these case reports, as well as his own experience and knowledge when he formed his initial diagnosis. Given that Dr. Ruggiero continued to treat Mrs. Deutsch, he is permitted to base his continued belief that her ONJ was caused by Aredia and Zometa on information available to him at the time to the extent that her treatment related to her ONJ or prevention of future ONJ.

The Court has not been provided with any evidence that Dr. Ruggiero intends to rely on information obtained for litigation as opposed to information acquired for and during Mrs. Deutsch's treatment. "The exact boundaries of the treating physician's testimony may need to be addressed with specific objections to specific testimo-

ny in the context of trial." *Baratta v. City of Largo,* No. 01–CV–1894, 2003 WL 25686843, at *3 (M.D.Fla. Mar. 18, 2003). Accordingly, if Dr. Ruggiero's testimony extends beyond his experience as Mrs. Deutsch's treating physician and his opinions based on that treatment, Novartis may raise the relevant objections at the trial. *See Levine v. Wyeth Inc.,* 09–CV–854, 2010 WL 2612579, at *1 (M.D.Fla. June 25, 2010) ("However, if a treating physician testifies on information gathered outside of the course of treatment and the party does not file a Rule 26(a)(2)(B) report as to that testimony, it may be excluded."). *See Aredia Forman,* 2009 WL 2496859, at *2 n. 3 ("Whether an expert report is required seems to depend largely on whether the expert's opinion will be limited to testimony based on her personal knowledge of the factual situation or whether the testimony will be based on information she utilized to develop specific opinion testimony; *i.e.,* knowledge acquired or developed in anticipation of litigation."); *Zanowic,* 2002 WL 373229, at *2 ("However, with respect to opinions unrelated to his treatment, Dr. Giovinazzo was subject to Rule 26(a)(2)."); *McEachron v. Glans,* No. 98–CV–885, 1999 WL 33597331, at *4 (N.D.N.Y. Feb. 24, 1999) ("[W]here the opinion of a treating physician derives from information or concerns matters obtained outside the scope of treatment, a treating physician may become subject to the report requirement of Rule 26(a)(2)(B) and, if a report is not timely served, such opinion testimony of a treating physician may be precluded.").

As to the differential diagnosis, the Court finds that Dr. Ruggiero's qualifications and the fact that the results of Mrs. Deutsch's differential diagnosis were among those published in a peer-reviewed publication support the reliability of his methodology. *See In re Zyprexa Prods.*

*Liab. Litig.*, 489 F.Supp.2d 230, 286 (E.D.N.Y.2007) ("While the predicates for Dr. Levy's proposed specific causation testimony may appear to be weak, her distinguished background and clinical experience warrant permitting her to testify.") "As long as an expert's scientific testimony rests upon good grounds, based on what is known, it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." *In re Fosamax Prods. Liab. Litig.*, 688 F.Supp.2d 259, 268 (S.D.N.Y.2010) (internal quotation marks and citations omitted).

Based on the portions of deposition testimony submitted to the Court, the Court does not find any grounds to conclude that Dr. Ruggiero made uniformed determinations as to what potential risk factors to rule out. To the extent that Novartis disagrees with what factors Dr. Ruggiero did and did not rule out, or with the records Dr. Ruggiero did or did not review, this is a proper subject for cross-examination. Accordingly, Novartis' motion to exclude Dr. Ruggiero's testimony on specific causation is denied with the caveat that Dr. Ruggiero is not permitted to testify beyond his experience as Mrs. Deutsch's treating physician and his opinions based on that treatment.

### 5. Dr. Gelfman

Finally, Novartis seeks to exclude the causation testimony of Dr. Gelfman, one of Mr. Napolitano's treating physicians, on the grounds that his differential diagnosis of BRONJ is unreliable.

Whether Dr. Gelfman's differential diagnosis provides a reliable basis for his opinion is not a clear cut question. Dr. Gelfman performed a differential diagnosis on Mr. Napolitano, but he does not remember what factors he considered at the time, (Gelfman Dep. at 82:11–14) or what specific literature he relied upon outside of various case reports (*Id.* at 82:25–83:17; 85:2–4.). While Dr. Gelfman demonstrated an awareness of certain risk factors such as chemotherapy, steroids, and corticosteroids (*Id.* at 111–115), and noted that he did not evaluate Mr. Napolitano's dental history prior to his use of Zometa because that "[t]hat would not be usual" (*Id.* at 61:9–15), he was not aware that smoking was a risk factor (*Id.* at 116) or of any association between cancer type and ONJ (*Id.* at 118:22–3). However, Dr. Gelfman testified that he did not know when Mr. Napolitano started taking Zometa or how many doses of Zometa he was given. (*Id.* at 70:10–19.)

On the other hand, Dr. Gelfman's qualification to diagnose ONJ weighs in favor of reliability. Dr. Gelfman is a board certified oral maxillofacial surgeon and is a member of a number of professional organizations including the AAOMS. Prior to treating Mr. Napolitano, Dr. Gelfman testified that he was aware of potential adverse side effects of Zometa and Aredia based on a number of lectures he had attended. (*Id.* at 24–25; 26:18–22.) In addition, prior to treating Mr. Napolitano, Dr. Gelfman had treated one other patient who he believed contracted ONJ through the use of bisphosphonate medications (*Id.* at 25:21–26:4.) Also, while treating Mr. Napolitano, Dr. Gelfman spoke with a colleague at Long Island Jewish Hospital, which the deposition excerpts submitted to the Court suggest may have been Dr. Ruggiero, regarding ONJ and its purported relationship to bisphosphonates. (*Id.* at 29:7–16.) Furthermore, Dr. Gelfman's testimony regarding the differences between exposed bone in the jaw caused by osteomyelitis and exposed bone caused by bisphosphonates demonstrates an expert understanding of ONJ. (*Id.* at 109:13–21.)

Ultimately, the Court cannot conclude that Dr. Gelfman's opinion on specific causation is scientifically unreliable. His lack of memory with regard to what he did and did not rule out when performing his differential diagnosis can be explored on cross-examination. The Second Circuit has held that "there should be a presumption of admissibility of evidence." *Borawick v. Shay,* 68 F.3d 597, 610 (2d Cir.1995); *see Zyprexa,* 489 F.Supp.2d at 282 (noting that "the assumption the court starts with is that a well qualified expert's testimony is admissible"); *see also Lidle v. Cirrus Design Corp.,* No. 08–CV–1253, 2010 WL 2674584, at *4 (S.D.N.Y. July 6, 2010). Because the Court finds that Dr. Gelfman is a qualified oncologist who was aware of the connection between IV BP drugs and ONJ, as well as many of the potential risk factors when performing his differential diagnosis, the Court denies the *Daubert* motion by Novartis to exclude his causation testimony. However, as with Dr. Ruggiero, Dr. Gelfman's testimony is limited to his experience as Mr. Napolitano's treating physician and his opinions based on that treatment.

## I. Plaintiffs' Daubert Motions to Exclude Testimony on the Causation of BONJ by Defendant's Oncologist Experts

■ Both Plaintiff Forman and Plaintiff Deutsch filed *Daubert* motions to exclude the testimony as to the general causation of BONJ and the specific causation of BONJ in Mrs. Deutsch and Mr. Napolitano by the oncologic experts of Novartis. Specifically, Plaintiff Forman moves to exclude the testimony of Drs. Arthur I. Goldberg and Todd M. Zimmerman with regard to general causation and the specific causation of Mr. Napolitano's ONJ. Also, Plaintiff Deutsch moves to exclude the general causation opinions of Drs. Robert E. Coleman, Allan Lipton, and Francis P. Arena, and the specific causation opinions as to Mrs. Deutsch of Drs. Coleman and Arena. The Plaintiffs' contend that all five of Novartis' experts are unqualified to opine on general causation because they neither treat, diagnose, study, or otherwise have any training in BONJ or any other disease of the mouth. In addition, with respect to the Novartis experts that render opinions on specific causation, the Plaintiffs' contend they are unqualified to opine on the specific cause of Mr. Napolitano or Mrs. Deutsch's BONJ because they were not their treating physicians and never examined or performed physical examinations of Mrs. Deutsch or Mr. Napolitano. Novartis contends that these experts' opinions are admissible because they are being proffered to critique the methodologies and rebut the opinions of the Plaintiffs' causation experts, and specifically to opine on the possible non-Aredia or Zometa risk factors or causes of ONJ.

### 1. The Novartis Experts

#### a. Dr. Robert E. Coleman

Dr. Coleman is the head of the Cancer Research Centre and a Professor and Honorary consultant Medical Oncologist in the Academic Unit of Clinical Oncology at West Park Hospital in Sheffield, United Kingdom. Dr. Coleman is the Chairman of the NCRI Breast Cancer Study Group and a Past–President of the Cancer & Bone Society of the British Oncological Association. Since the mid–1980's, Dr. Coleman has been involved in researching and prescribing bisphosphonate drugs including Aredia and Zometa. Dr. Coleman has been involved in clinical trials for Aredia and Zometa, and made a presentation at the 2002 meeting of the Oncologic Drug Advisory Committee of the FDA, where Zometa was being considered for approval by the FDA. From 2003 Dr. Coleman has served as the Principal Investigator for

two Zometa research studies—the AZURE and BISMARK trials—where he monitors and reports potential ONJ cases among patients participating in the clinical trials. Dr. Coleman has published over 63 peer-reviewed publications on bisphosphonates, many of which were written after 2003 and address ONJ. In addition, Dr. Coleman has given more than sixty presentations addressing bisphosphonate drugs, at least five of which were focused on the issue of ONJ in users of bisphosphonate drugs. Finally, Dr. Coleman attended the Novartis first Advisory Board meeting on ONJ in December of 2003.

### b. Dr. Allan Lipton

Dr. Lipton is a Professor of Medicine at The Milton S. Hershey Center of the Pennsylvania State University and is board certified in internal medicine and oncology. Prior to becoming a Professor of Medicine, Dr. Lipton served as the Chief of the Division of Oncology from 1973–2003. Dr. Lipton has been prescribing Aredia since the 1980's and Zometa since the late 1990's, and was involved in both the Aredia and Zometa clinical trials. Currently, Dr. Lipton is an investigator in the OPTIMIZE trial, which is investigating the efficacy and potential alternative dosing schedules for Zometa in breast cancer patients with bone metastasis. As to his publication experience, Dr. Lipton has authored more than 100 manuscripts, book chapters, and abstracts relating to bisphosphonate drugs. In addition, Dr. Lipton conducts lectures ten to twenty times a year on bisphosphonate drugs that frequently include discussions of ONJ. Dr. Lipton also attended the Novartis first Advisory Board meeting on ONJ in December of 2003.

### c. Dr. Francis P. Arena

Dr. Arena has been in private practice as an oncologist and hematologist in Great Neck, New York for more than 25 years and is board certified in internal medicine and oncology. Dr. Arena's publishing experience includes more than forty articles and abstracts involving the diagnosis and treatment of breast, colon, and lymphoproliferative disorders. In addition to his private practice, Dr. Arena serves as an Attending Physician at the North Shore–LIJ Health System and New York Presbyterian Hospital and he is on the editorial boards for the journals Oncology and Community Oncology. In his practice, Dr. Arena has treated approximately 800 to 900 patients with Aredia and Zometa.

### d. Dr. Arthur I. Goldberg

Dr. Goldberg is a board certified clinical oncologist with over 33 years of private practice experience in the New York area. Dr. Goldberg is a member of a number of professional medical societies including the AOA Medical Honor Society, the American Society of Clinical Oncologists, and the American Association of Cancer Research. During the course of his practice, Dr. Goldberg has treated approximately 500 to 800 patients with Zometa for bone metastases from cancer, including many patients with prostate cancer.

### e. Dr. Todd M. Zimmerman

Dr. Zimmerman is currently an Associate Professor of Medicine at The University of Chicago Medical Center and is board certified in internal medicine and medical oncology. In association with his practice, Dr. Zimmerman has treated hundreds of patients with bisphosphonate drugs. In addition, Dr. Zimmerman is an investigator in the University of Chicago Cancer Research Center and a member of the Project Review Committee of the Multiple Myeloma Research Consortium. With regard to his publication related experience, Dr. Zimmerman is an ad hoc reviewer for many hematology and oncology journals.

## 2. General Causation

In their respective reports, Novartis' experts opine on topics such as the benefits of Zometa or Aredia as compared to the potential risk of contracting ONJ; the lack of scientifically reliable proof of causation; and potential alternate causes of ONJ. The experts primarily based their general causation opinions on their review of the relevant medical literature and their own personal experiences as prescribing physicians. According to the Plaintiffs, all of the Novartis experts are unqualified to make any statements as to potential "alternate causes" of BONJ or risk factors. In addition, the Plaintiffs' contend that the experts' review of the literature is insufficient to support their opinions because it is outside their field of expertise, and that their opinions contradict their own personal experience where they have either seen no cases of ONJ, or have only seen cases in patients with a history of bisphosphonate use. The Plaintiffs' specific objections to the qualifications of the Novartis experts will now be reviewed.

Plaintiff Deutsch asserts that Dr. Coleman is not qualified to opine on the general cause of ONJ because he is not a dentist or an oral and maxillofacial surgeon; he is not expert on osteonecrosis of the jaw; and he is not an expert on oral osteomyelitis. Plaintiff Deutsch further contends that Dr. Coleman is not qualified to opine on any non-bisphosphonate risk factor for ONJ based on his limited clinical experience. In addition, Plaintiff Deutsch contends that Dr. Coleman's opinion is undermined by the fact that the only cases of ONJ that he has seen in his practice and the AZURE clinical trial have occurred in patients taking bisphosphonates.

Furthermore, Plaintiff Deutsch primarily disputes the qualification of Dr. Lipton to opine on general causation of ONJ based on his association with Novartis and

the pharmaceutical industry; the fact that his personal experience with patients who had ONJ contradicts his testimony; and the fact that he is not a "dental person." Similarly, Plaintiff Forman objects to Dr. Zimmerman on the grounds that he has longstanding contacts with Novartis; that he is not a pathologist, dentist, or oral surgeon; and because all of his knowledge is derived from the literature.

Finally, Plaintiff Deutsch contend that Drs. Goldberg and Dr. Arena are not qualified to offer general causation opinions insofar as they are not dentists, oral and maxillofacial surgeons, pathologists, bone specialists, experts in the area of the oral cavity of the maxilla or the mandible, or experts in causality of osteonecrosis. In addition, Plaintiff Deutsch contends that Drs. Goldberg and Arena are unqualified because their knowledge as to alternate dental causes of ONJ is solely derived from literature and not personal experience insofar in that they do not treat or diagnose ONJ.

For its part, Novartis asserts that both Drs. Coleman and Lipton are world-renowned oncologists and possess a special expertise with regard to the benefits and risks of Aredia and Zometa therapy used in the treatment of cancer patients with metastatic bone disease. According to Novartis, Drs. Coleman and Lipton have been involved in the discussion regarding a possible association between Aredia and Zometa and ONJ since before the first case reports were published in 2003. In addition, they reviewed medical literature regarding reports of a possible association between bisphosphonates and ONJ prior to being retained in this litigation and/or preparing their expert report. In further support of their qualifications, Novartis points to their clinical responsibilities in examining and assessing reports of adverse events that related to chemotherapy

and other cancer treatment drugs that they prescribe, many of which have potentially severe side effects. With regard to Drs. Goldberg, Zimmerman, and Arena, Novartis argues that all three of the experts are highly qualified oncologists who frequently prescribe Zometa or Aredia and who educate themselves on all the facets of the medications they prescribe.

The qualification requirements of Rule 702 "must be read in light of the liberalizing purpose of the rule." *United States v. Brown,* 776 F.2d 397, 400 (2d Cir.1985). "[Q]ualification is viewed liberally and is determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *In re Fosamax Prods. Liab. Litig.,* 645 F.Supp.2d 164, 202 (S.D.N.Y. 2009). "[T]he fact that a physician is not a specialist in the field in which he is giving expert opinion does not affect the admissibility of the opinion, but rather the weight the jury may place on it." *Id.; see also Rupolo v. Oshkosh Truck Corp.,* No. 05–CV–2978, 749 F.Supp.2d 31, 2010 WL 2244386 (E.D.N.Y. June 01, 2010). "In general, expert opinions which assess or critique another expert's substantive testimony are relevant, but opinions which attack an expert's credibility (*e.g.,* testimony than an expert is lying) are not." *In re Cessna 208 Series Aircraft Prods. Liab. Litig.,* No. 05–MD–1721, 2009 WL 1649773, at *1 (D. Kan. June 9, 2009); *Nimely v. City of New York,* 414 F.3d 381, 398 (2d Cir.2005) ("[E]xpert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible under Rule 702.").

Here, Novartis is not seeking to have their experts usurp the jury's role in assessing the credibility of the Plaintiffs' experts, but rather to refute the factual basis for their opinions. The Plaintiffs' arguments focus on the fact that the Novartis experts question the "scientific reliability" of the Plaintiffs' experts' opinions. While the Plaintiffs' correctly note that it is the provenance of the Court to determine whether a methodology employed by an expert is "scientifically reliable," parties are free to question the scientific reliability of conclusions based on the underlying facts of the analysis. *See In Zyprexa Prods. Liab. Litig.,* 489 F.Supp.2d 230, 285 (E.D.N.Y.2007) ("It is worth noting in this respect that defendants' experts have a less demanding task, since they have no burden to produce models or methods of their own; they need only attack those of plaintiffs' experts. Contradiction is to be expected and is often unresolvable without trial.").

The Court finds that Drs. Goldberg, Zimmerman, Coleman, Lipton, and Arena are all qualified to present their general causation opinions. Not only are both Drs. Coleman and Lipton undisputed experts in the field of oncology, but both have experience prescribing Zometa and Aredia over the last three decades; conducting multiple clinical trials regarding Zometa and Aredia; and publishing hundreds of articles about bisphosphonates, many of which involve their association with ONJ. Although some of their experience was commissioned by Novartis or otherwise funded by Novartis, that does not in and of itself render their opinions unreliable. The Plaintiffs' have not pointed to any specific opinions that raise an inference of unreliability based on a suspected conflict of interest. To the extent the Plaintiffs' believe their opinions lack credibility based on this association, they are free to explore this issue on cross-examination. *See In re Viagra Prods. Liab. Litig.,* 572 F.Supp.2d 1071, 1088 (D.Minn.2008) ("Plaintiffs further contend

that [the defense expert's] testimony is unreliable because he relies on Pfizer-sponsored research, did not perform any research himself, and prepared his report only as part of this litigation. These claimed deficiencies are matters for cross-examination.").

Although lacking the extensive clinical and research background of Drs. Coleman and Lipton, Drs. Arena, Goldberg, and Zimmerman are also sufficiently qualified to opine on causation based on their training and personal experiences as clinical oncologists. Dr. Arena has treated approximately 800 to 900 patients with Aredia and Zometa and Dr. Goldberg has treated 500 to 800 patients with Zometa. Dr. Zimmerman has given several presentations about bisphosphonates and the treatment of metastatic bone disease; has treated hundreds of patients with bisphosphonates; and examines reports of adverse events that relate to other types of cancer treatments. Drs. Arena, Goldberg, and Zimmerman's training and experience as medical professionals and extensive experience with prescribing Aredia and Zometa qualify them to refute the Plaintiffs' experts' causation opinions.

The Court also finds that the Plaintiffs' contention that these experts cannot opine on the adequacy of the testimony of the Plaintiffs' experts, to be inconsistent with the position that the Plaintiffs' have taken in defense of their own experts. Novartis has pointed time and again to other articles within the medical literature that the Plaintiffs' experts failed to consider in their analysis, and have questioned the weight certain articles should be given by the jury. Cross-examination is not the only way that a party can refute the factual basis for an expert's opinions. While the Court agrees with the Plaintiffs that there is a substantial amount of literature identifying an association between bisphos-

phonates and ONJ, the Court also notes that there is a substantial amount of literature supporting the theory that non-bisphosphonate risk factors can cause ONJ. (See Calhoun Decl. to the Ray Daubert Motion at Ex. 2(a)–2(k).) The Court will not deny Novartis the opportunity to dispute the factual basis for the Plaintiffs' conclusions. All of the Plaintiffs' arguments regarding the personal experiences of the experts or the articles they reviewed go to the weight and not the admissibility of the opinions. Accordingly, the Court denies the Plaintiffs' motions to exclude the general causation opinions of Drs. Coleman, Lipton, Arena, Goldberg, and Zimmerman.

### 3. Specific Causation

Novartis intends to offer the testimony of Drs. Arthur Goldberg and Todd Zimmerman to rebut the Plaintiffs' experts' opinions regarding specific causation as to Mr. Napolitano. In addition, Novartis intends to offer the testimony of Drs. Robert Coleman and Francis Arena to rebut the Plaintiffs' experts' opinions regarding specific causation as to Mrs. Deutsch. The Plaintiffs contend that the opinions of these four witnesses should be excluded as unreliable because they are unqualified to offer these opinions and because they did not personally examine Mrs. Deutsch or Mr. Napolitano.

Drs. Goldberg, Zimmerman, Coleman and Arena all opine that the Plaintiffs' experts opinions that Mr. Napolitano's and Mrs. Deutsch's ONJ were caused by IV BP drugs are scientifically unreliable because they failed to consider certain factors, including, among other things, cancer type, other cancer treatments, tooth extractions, and history of smoking in reaching their conclusions. (Coleman Report at 24; Arena Report at 15–16; Goldberg Report at 9; Zimmerman Report at 21–22.) In addition, Drs. Goldberg and Zimmer-

man dispute the factual basis for the opinion that Mr. Napolitano developed ONJ as a result of Zometa therapy based on the dose of Zometa that he received. (Goldberg Report at 9–10; Zimmerman Report at 21.) Novartis contends that the role of these witnesses is to identify possible alternative causes of the alleged ONJ suffered by Mr. Napolitano and Mrs. Deutsch, not to provide an affirmative specific causation opinion. Novartis has offered these experts' opinions that: (1) Zometa was an appropriate therapy for Mr. Napolitano and Mrs. Deutsch, and (2) the Plaintiffs' experts' opinions are insufficient because they fail to account for Mrs. Deutsch and Mr. Napolitano's other present risk factors.

The question of whether an expert is qualified to offer an opinion and whether they utilized a reliable methodology are two separate inquiries. Here, the Court finds that all of these experts are highly trained oncologists with experience treating the specific types of cancer that Mr. Napolitano and Mrs. Deutsch had, and in prescribing Aredia and Zometa to treat those conditions. As such, the Court finds that these experts are qualified to rebut specific causation testimony with regard to alternate causes. As to whether they implemented a reliable methodology, the Court disagrees that the experts were required to perform a personal examination of Mr. Napolitano or Mrs. Deutsch. "[E]valuation of the patient's medical records, like performance of a physical examination, is a reliable method of concluding that a patient is ill even in the absence of a physical examination." *In re Paoli R.R. Yard P.C.B. Litig.*, 35 F.3d 717, 762 (3d Cir.1994); *cf. Winter v. Hartford Life and Accident Ins. Co.*, 309 F.Supp.2d 409, 415 (E.D.N.Y.2004) (ADS) ("Because Dr. Kazda never examined the plaintiff, his opinions about Winter's medical condition are entitled to less weight than the plaintiff's treating physicians who were in a better

position to evaluate the extent and severity of her pain.").

The experts based their analysis on Mr. Napolitano's and Mrs. Deutsch's medical records, the expert reports of the Plaintiffs' oncologist experts Drs. Vogel and Skubitz, and in the case of Drs. Coleman and Arena, the deposition testimony of Mrs. Deutsch's treating physicians. This methodology is appropriate where, as here, the experts are not offering an opinion on what caused the injury or illness, but rather why the existence of alternate risk factors indicates that a particular opinion on causation cannot be determined. *See In re Baycol Prods. Litig.*, 2008 WL 6259241, at *9 (D.Minn. Sept. 9, 2008) (denying a *Daubert* motion to exclude the testimony of a qualified cardiologist who regularly prescribed Baycol in his practice where the expert did not offer an opinion on what caused the Plaintiff's injury but rather "reviewed Plaintiff's medical records, available medical literature, and the depositions in this matter, and … offered an opinion which excludes Baycol as a potential injury causing agent for this Plaintiff."); *cf. In re Mentor Corp. ObTape Transobturator Sling Prods. Liab. Litig.*, No. 08–MD–2004, 2010 WL 1782272, at *4 (M.D.Ga. April 29, 2010) ("However, because the scope of their rebuttal appears to be limited to identifying possible alternative causes of Plaintiffs' injuries and not performing an independent differential etiology, these four witnesses shall not be permitted to testify that alternative causes, such as surgical technique or doctor error, actually caused Plaintiffs' injuries.").

Accordingly, the Court denies the Plaintiffs' *Daubert* motion to exclude the specific causation opinions of Drs. Goldberg, Zimmerman, Coleman and Arena. *See In re Cessna 208 Series Aircraft Prods. Liab. Litig.*, No. 05–MD–1721, 2009 WL 1649773, at *1 (D. Kan. June 9, 2009) ("The expert reports of [defendant's] experts pri-

marily critique the methodology and scientific principles which plaintiffs' experts use to arrive at their conclusions. Such evidence, which attacks the opposing expert's substantive testimony, is proper rebuttal.").

### III. CONCLUSION

This opinion constitutes the Court's rulings on the parties' *Daubert* motions and the Plaintiffs' motion to unseal documents. The Court has considered all other arguments by the parties and finds them to be without merit. Furthermore, in accordance with this order, the parties are directed: (1) to appear on Wednesday, March 16, 2011 at 9:00am for a conference to set a trial date and (2) to appear on Monday, April 11, 2011 at 9:00am for a *Daubert* hearing to determine the admissibility of Dr. Parisian's opinions on Novartis' compliance with FDA regulations.

**SO ORDERED.**